ORDER AND JUDGMENT*
TERRENCE L. O’BRIEN, Circuit Judge.
Michael Steven Morgan, an attorney and politician, appeals from a bribery eonvic *425 tion. See 18 U.S.C. § 666. As he would have it, the evidence was insufficient to convict and the jury was not properly instructed on specific intent. Not only that, but he should have a new trial because the government failed to disclose tacit agreements with a witness. The government’s cross-appeal claims Morgan’s sentence (no incarceration; only probation) is substantively unreasonable given the nature of his crime. We affirm the conviction but reverse and remand for resentencing.
I. Trial Evidence
Morgan, a practicing attorney, was elected to the Oklahoma State Senate in 1996 and remained a senator until he was term-limited in 2008.[1] See Okla. Const., art. V, § 17A (establishing a twelve-year term limit for state legislators). He served as the chairman of the appropriations committee in 2004 and became President Pro Tempore (Pro Tem)[2] of the Senate in March 2005.[3] The bribery occurred while he occupied that august position.
In 2005 and 2006, members of the Oklahoma Assisted Living Association (“OKA-LA”) became unhappy with the Oklahoma Department of Health’s (ODH) enforcement activities. It was removing residents from assisted living facilities to nursing homes because the assisted living facilities were unable to provide the necessary level of care. Sam Crosby, part owner of OKA-LA member Silver Oak Senior Living, was extremely vocal regarding his objections to the ODH’s efforts. He claimed Silver Oak was targeted by the ODH and repeatedly had to deal with what he perceived as unfair civil fines. He hired several law firms and lawyers to assist with these disputes. A lawyer in one of the firms specialized in dealing with the ODH.
In May 2006, Crosby hired lobbyist Benny Vanatta to promote Silver Oak’s position with the legislature. Vanatta immediately arranged a meeting with Crosby and Morgan in Morgan’s office at the Capitol. According to Crosby’s testimony, they met for “about an hour to an hour and a half.” (Morgan’s App’x, Vol. 5 at 1904.) His testimony continued as follows. I told “them all my troubles and the fights with the [ODH] and everything and that I needed some help. I didn’t care whether it was a phone call, legislation, meetings, whatever, I just needed some help to get them off my back.” (Id.) About forty-five minutes into the meeting, Vanatta left to get coffee. *426 While Vanatta was gone, Morgan told Crosby, “This is the way it works. You pay me a $1,000 a month retainer.” (Id.) Morgan assured Crosby the arrangement was legal. Crosby asked, “Well, do I maybe get some traffic tickets or something for that [amount]?”[4] (Id.) Morgan told Crosby to call his law firm and it will “help you with [the traffic tickets].” (Id.) In the end, even though it “[d]idn’t sound right” to Crosby, Silver Oak made twelve $1,000 payments to Morgan from July 2006 until July 2007.[5] (Id.)
Shortly after that meeting, Dorya Hus-er, chief of the ODH’s long-term care division, was contacted by her supervisor, Rocky McElvany. McElvany told Huser they “had a request from a legislator to come talk about the rules.” (Morgan’s App’x, Vol. 5 at 1949.) As a result, Vanat-ta, Crosby, and his partner Eric Lindsey met with Huser and McElvany in Morgan’s conference room at the Capitol (Morgan was present, according to Crosby’s testimony. Morgan said he did not attend the meeting but did stop in for a moment to say hello to the participants). The meeting did not go well. Huser testified to the encounter being “extremely contentious.” (Id. at 1950.) A few weeks later, on June 15, 2006, Crosby e-mailed a letter to numerous House and Senate members complaining about the ODH ■ proposing .regulations “that would limit the [living] choice[s] of seniors” and improperly interpreting existing regulations to the detriment of seniors. (Id., Vol. 7 at 2638.) He accused the ODH of having “a hidden agenda to destroy the Assisted Living concept and industry.” (Id.)
That same month, at Crosby’s direction, Belinda Arguello, Silver Oak’s director of compliance, began sending e-mails to Morgan [6] reporting Silver Oak’s ongoing difficulties with the ODH. She attached communications between Silver Oak and the ODH. When Morgan had not substantively responded by August, Crosby suggested an e-mail be sent from his e-mail address to ensure Morgan had received the information. There still was no response. The only communication between Crosby and Morgan after the meeting in May 2006 was a visit from Morgan to Crosby’s office seeking a campaign contribution for another candidate. Crosby also said he attempted to contact Morgan’s law office several times concerning traffic tickets. His testimony was clear enough: Morgan never assisted Silver Oak as a lawyer in dealing with the ODH or any other matter, but he found another way to be helpful.
In January 2007, Morgan authored and introduced Senate Bill 738 (S.B. 738). It provided:
If a resident in an assisted living center is receiving care in addition to the room, board, and personal care specified in the Continuum of Care and Assisted Living Act as determined by a physician, the State Department of Health shall not order the removal of the resident from *427 the assisted living center if the following conditions are met:
1. The resident, resident’s family or legal representative, the resident’s physician, and the owner, operator or governing body of the assisted living center consent to the resident’s continued stay in the assisted living center; and
2. The owner, operator, or governing body of the assisted living center commits to assuring that the resident receives necessary additional services.
(Morgan’s App’x, Vol. 7 at 2680-81.) Hus-er concluded the purpose of Morgan’s bill “was to tell the [ODH] to leave assisted living facilities alone and not.be writing these level-of-care deficiencies.” (Id,, Vol. 5 at 1953.) Mary Brinkley, the executive director of an association of aging services providers, testified about her choice not to lobby against the bill in the Senate because Morgan had introduced it — “[I]t’s really hard to go up against leadership and to change a bill or to make any amendment to it.” (Id. at 1879.)
After the bill passed unanimously in the Senate, it was amended in the. House to provide more detail.[7] But even in its final version, S.B. 738 favorably addressed many of Crosby’s concerns.
The Governor signed S.B. 738 into law on June 4, 2007. Silver Oak’s last monthly payment to Morgan was on July 20, 2007. On August 13, Crosby sent Morgan a letter thanking him for his “assistance to our program” and terminating his retainer because Silver Oak had “elected to limit [its] political involvement for a while.”[8] (Morgan’s App’x, Vol. 7 at 2701.)
II. Procedural History
On March 30, 2011, a grand jury indicted Morgan with respect to three clients who paid him monthly retainer fees. Counts 1 through 29 related to fees ($141,-664.52) he received from Dilworth Development, a small landfill company in Northern Oklahoma, from April 2006 to May 2008. Count 1 alleged he conspired with attorney N. Martin Stringer and lobbyist William Andrew Skeith to accept the fees in exchange for his legislative influence on behalf of Dilworth. Counts 2 through '29 alleged extortion in violation of 18 U.S.C. § 1951(a) and mail fraud (honest services) in violation of 18 U.S.C. §§ 1341 & 1346.
Counts 30 through 62 had to do with fees ($250,000) Morgan collected between April 2006 and December 2008 from Te-naska, Inc., a Nebraska energy corporation with business interests in Oklahoma. These counts alleged Morgan conspired with Stringer and Skeith to accept the fees in return for legislative influence (Count 30) and engaged in mail fraud (honest services) in violation of 18 U.S.C. §§ 1341 & 1346 (Counts 31-62).
*428 Count 63 charged bribery under 18 U.S.C. § 666(a)(1)(B) based on Morgan’s receipt of $12,000 from Silver Oak. Morgan was the only defendant named in the Silver Oak count.
After the government’s evidence was complete and it rested, the district court dismissed many of the charges, including Count 30 — the conspiracy count relating to Tenaska — as to Morgan.[9] After a trial lasting over two weeks, the jury convicted Morgan of bribery in connection with Silver Oak (Count 63). It was unable to reach a verdict on Counts 2 through 29— the extortion and mail fraud counts relating to Dilworth. It acquitted Morgan on Count 1 — the conspiracy count relating to Dilworth — and the mail fraud charges relating to Tenaska (Counts 31 through 62). The court denied Morgan’s post-trial motion trial.
III. Morgan’s Direct Appeal

A. Sufficiency of the Evidence

“Whether the government presented sufficient evidence to support a conviction is a legal question we review de novo.” United States v. Hernandez, 509 F.3d 1290, 1295 (10th Cir.2007) (quotations omitted). We “ask[ ] only whether, taking the evidence — both direct and circumstantial, together with reasonable inferences to be drawn therefrom — in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt.” United States v. Baldridge, 559 F.3d 1126, 1134 (10th Cir.2009) (quotations omitted). “We will not reverse a conviction unless no rational trier of fact could have reached the disputed verdict. The evidence necessary to support a verdict need not conclusively exclude every other reasonable hypothesis and need not negate all possibilities except guilt.” Id. (quotations omitted).
To establish a violation of 18 U.S.C. 666(a)(1)(B), the government must, of course, prove all elements of the offense beyond a reasonable doubt. See In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (“[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.”). Among those elements, and critical to this appeal, is that Morgan, while an agent of the State of Oklahoma, “corruptly solicit[ed] or demanded] ... or accepted] or agree[d] to accept” Silver Oak’s retainer payments while “intending to be influenced or rewarded in connection with any business, transaction, or series of transactions” of'the State of Oklahoma. 18 U.S.C. § 666(a)(1)(B). Morgan claims the government’s evidence on this element fell short. According to him, a bribery conviction requires proof of a quid pro quo, which, also according to him, requires a corrupt agreement between the payor and payee. In other words, as Morgan would have it, the government is required to show both he and Crosby acted with a corrupt intent. He says there was no evidence establishing Crosby’s corrupt intent — Crosby never testified to having intended to bribe. Morgan and his testimony about needing “help” during their initial meeting is not enough for a jury to infer intent. (Morgan’s App’x, Vol. 5 at 1905.)
*429 He also claims the following evidence indicates Crosby’s intent was not to obtain his help in the legislature but rather to retain him for legitimate legal services: (1) Arguello’s e-mails to him, (2) Crosby’s request for help with traffic tickets, (3) Crosby’s knowledge of Morgan’s past successful litigation against state agencies,[10] and (4) Crosby’s admitted lack of knowledge of S.B. 738 until the government handed him a copy of the bill when it recruited his testimony.[11]
In support of his argument that both parties must have a corrupt intent, Morgan relies primarily on United States v. Dean, 629 F.3d 257 (D.C.Cir.2011). Dean was employed by the District of Columbia Department of Consumer and Regulatory Affairs (DCRA). Among other things, she processed “various license applications, for example, licenses needed, by establishments for their elevators.” Id. at 258. Her scheme was to inform applicants the payments for a timely license submission could be made by check but all late fees had to be paid in cash. Id. She would then keep the cash payments for her own use. Id. After a local hotel employee informed the Federal Bureau of Investigation (FBI) about this activity, the FBI set up a sting operation. Id. The hotel employee (acting on instruction from the FBI) approached Dean seeking additional licenses. Consistent with her general scheme, Dean informed the employee that the timely license fees may be paid by check but late fees of $1,275 could only be paid in cash. Id. After the employee gave Dean the $1,275 in cash, Dean was arrested, charged, and subsequently found guilty of soliciting a bribe and extortion. Id.
The appellate court reversed her conviction, writing:
There was no agreement between the parties that the $1275 was for Dean personally. She accepted the money ostensibly on behalf of the DCRA with every indication that the fee was required for the [license]. Furthermore, we see nothing in the record to suggest that the [hotel] expected favorable processing of the license or that Dean agreed to provide favorable processing.
Id. at 260. Therefore, the government failed to prove an agreement between Dean and the hotel that she would perform her official duties in return for a personal benefit to the hotel. Id. at 259-60.
Dean, however, does not require proof of corrupt intent on the part of both parties. As the D.C. Circuit subsequently made clear, the use of the word “agreement” in Dean was
used as a synonym for specific intent. When, as in Dean, a public official is charged with ' soliciting a bribe, the evidence must show that the official conveyed an intent to perform official acts in exchange for personal benefit. Accordingly, the element absent in Dean *430 [was] an intent to offer or solicit an exchange of official action for personal gain.
United States v. Ring, 706 F.3d 460, 468 (D,C.Cir.2013). Dean’s conviction was set aside not because the hotel employee lacked corrupt intent but because Dean did — she accepted or solicited the money ostensibly on behalf of the DORA but not with an intent to use her position or influence to garner favorable licensing treatment for the hotel. In other words, Dean’s crime was theft, not bribery.
The Ring case is even more instructive. Ring, a lobbyist, was convicted of honest-services fraud (by bribery) based on his having provided dinners, drinks, travel, concerts, and sporting events to congressional and executive branch officials. Id. at 464. Because he was prosecuted for honest services fraud on a bribery theory, the parties agreed the government had to prove the elements of bribery. Id. at 467. Like Morgan, however, Ring claimed the jury instructions were flawed because they failed to require the jury to find the public officials receiving the favors had agreed to the corrupt exchange. Id. at 466-67. But there was no error:
The bribery statute expressly criminalizes a mere “offer” of something of value with the intent to influence an official act. 18 U.S.C. § 201(b)(1). That the official need not accept that offer for the act of bribery to be complete is evident from the structure of the statute, which defines two separate crimes: the act of offering a bribe and the act of soliciting or accepting a bribe. See id. § 201(b)(l)-(2). Confirming this interpretation, the Supreme Court held in United States v. Brewster, 408 U.S. 501, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972), that, with respect to a bribe payee, the “acceptance of the bribe is the violation of the statute.” Id. at 526, 92 S.Ct. 2531. The parallel proposition in the context of a bribe payor is straightforward: the offer of the bribe is the violation of the statute. Indeed, we have made clear that the quid pro quo need not be “fully executed for the act to be considered a bribe.” Orenuga, 430 F.3d at 1166.
Because bribery does not require the official to agree to or actually complete a corrupt exchange, neither does honest-services fraud by bribery. Although we need look no further than black-letter bribery law to reach this conclusion, the fact that the wire fraud statute “ ‘punishes the scheme, not its success,’ ” Pasquantino v. United States, 544 U.S. 349, 371, 125 S.Ct. 1766, 161 L.Ed.2d 619 (2005) (quoting United States v. Pierce, 224 F.3d 158, 166 (2d Cir.2000)), lends further support to our conclusion that a defendant may be guilty of honest-services bribery where he offers an official something of value with a specific intent to effect a quid pro quo even if that official emphatically refuses to accept. In other words, though the offerer of a bribe is guilty of honest-services fraud, his attempted target may be entirely innocent. See United States v. Anderson, 509 F.2d 312, 332 (D.C.Cir.1974) (bribe payer’s culpability may differ from official’s culpability).
Id. at 467. Although Ring addressed 18 U.S.C, § 201, the statute prohibiting bribes and gratuities by federal officials, we see no reason a different result would follow under the statute here, § 666.[12]
*431 Morgan also relies on the Supreme Court’s decision in United States v. Sun-Diamond Growers of Cal., 526 U.S. 398, 119 S.Ct. 1402, 143 L.Ed.2d 576 (1999), where, when addressing § 201, the Supreme Court required a “quid pro quo — a specific intent to give or receive something of value in exchange for an official act.” Id. at 404-05, 119 S.Ct. 1402. Morgan hangs his hat on the “quid pro quo” language but his argument exceeds elastic limits. The Court was not saying bribery requires both parties to a bribe to have corrupt intent. Rather, it was distinguishing between bribery and an illegal gratuity, both penalized, but in different sections of § 201. Id. In the end, the Court merely held that to establish a violation of the illegal gratuity statute, “the Government must prove a link between a thing of value conferred upon a public official and a specific ‘official act’ for or because of which it was given.” Id. at 414, 119 S.Ct. 1402.
The key question in this case, then, is not whether both Morgan and Crosby had a corrupt intent but whether Morgan had a corrupt intent — whether he had the intent to receive the retainer fees from Silver Oak in exchange for his legislative influence.[13] Not surprisingly, Morgan says no. He points to the evidence establishing it is neither illegal nor unethical for him, as a legislator-lawyer, to have an attorney-client relationship with Silver Oak or to charge his clients a monthly retainer fee. He also claims the following evidence negates an inference of his having acted with a corrupt intent: (1) his regular arrangements with other clients for fees in the form of a nonrefundable monthly retainer; (2) his lack of involvement as S.B. 738 proceeded through the Senate and House; and (3) the bill’s application to the industry as a whole, not Silver Oak specifically. He also says the lack of any attempt to conceal his arrangement with Crosby — he deposited the fees into his law office account — belies any corruption.[14]
Morgan’s argument is unconvincing. The retainer agreement between Morgan and Crosby was made at a meeting at Morgan’s office in the Capitol. The meeting was brokered by a lobbyist hired to promote Silver Oak’s governmental relations. Crosby told Morgan “[he] didn’t care whether it was a phone call, legislation, meetings,” he just needed “help” in getting the ODH “off [his] back,” (Morgan’s App’x, Vol. 5 at 1905.) Morgan insisted on a monthly retainer, even though he could not represent Silver Oak before the ODH. See supra n.10. Shortly thereaf *432 ter, Huser learned that “a legislator” requested a meeting between the ODH and Silver Oak representatives to take place at the Capitol. (Id. at 1949.) Seven and a half months later, Morgan introduced a bill favorably addressing Silver Oak’s problems.
There was no written engagement letter in spite of the monthly “retainer” Morgan insisted upon.[15] Moreover, despite Morgan’s claim to be providing legal representation to Silver Oak, Arguello’s e-mails went unanswered, Morgan’s monthly bill to Silver Oak did not specify the legal services provided, and there was no evidence of any legal services actually performed for Silver Oak (absent Morgan’s self-serving claim to have consulted with Crosby about a possible lawsuit against the ODH). Finally, shortly after the bill was signed into law, Crosby informed Morgan that Silver Oak would no longer pay because its principals decided to limit its “political involvement.” (Morgan’s App’x, Vol. 7 at 2701 (emphasis added).)
The rules governing Oklahoma’s “citizen legislature” allow its members to maintain an outside source of income, something Morgan emphasizes. (Morgan’s App’x, Vol. 6 at 2392.) Indeed, he points to trial testimony establishing that a legislator-lawyer may continue to legislate on matters affecting a client’s interest, so long as the legislation is applied to an industry on a state-wide basis. But, as he admits, the same line of testimony also established such a practice to be unlawful if the legislator-lawyer is paid to do so. Neither federal law nor Oklahoma rules allow a legislator to accept payment in return for wielding political influence. Moreover, S.B. 738’s effect on the industry as a whole (even if beneficial) does not negate corrupt intent. “[A] valid purpose that partially motivates a transaction does not insulate participants in an unlawful transaction from criminal liability.” United, States v. Coyne, 4 F.3d 100, 113 (2d Cir.1993) (quotations omitted).
Finally, Morgan claims he did not attempt to cover up his facial arrangement with Crosby; he deposited the payments he received from Silver Oak into his law office account and testified that his arrangement with Crosby was for legal services he provided. But those aware of all of the facts, for instance the jurors, could conclude he did so merely to conceal the real purpose behind the payments. And that skepticism could well be justified. Parts of Morgan’s story are dubious. He claimed Crosby hired him to determine whether Silver Oak could sue the ODH. But Crosby’s legal armada included an attorney who specialized in dealing with the ODH. And Morgan had no written record of his communications with Crosby. He claims the lack of a written record was for Crosby’s protection, but the attorney-client privilege would most likely have adequately met that purpose.
Perhaps the hallmark of our jury system is the jury’s role in resolving uncertainty. It, alone, is left to find the facts. And the fruits of its effort lie in the verdict. The jury could have believed Morgan’s version of events but did not.[16] See United States *433 v. Oliver, 278 F.3d 1035, 1043 (10th Cir. 2001) (“It is left to the jury to weigh conflicting evidence and to consider the credibility of witnesses.”) (quotations omitted). Instead, this jury determined Morgan demanded retainer fees with the intent to “help” Crosby through his position as an influential legislator. Its decision is rationally supported by the evidence.[17]

B. Jury Instruction on Specific Intent

Morgan quarrels with the way the jury was instructed on the specific intent required for conviction. But he did not object to the instruction given, limiting our review to plain error. United States v. Davis, 750 F.3d 1186, 1191 (10th Cir. 2014). “Under Federal Rule of Criminal Procedure 52(b), an appellate court may, in its discretion, correct an error not raised at trial only where the appellant demonstrates that (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant’s substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings.” Id. (quotations omitted).
The relevant portion of the instruction governing the bribery charge required the jury to find beyond a reasonable doubt:
That the defendant solicited, demanded, accepted, or agreed to accept anything of value from another person; [and]
That the defendant did so corruptly, that is, with the intent to be influenced in connection with some business, transaction, or series of transactions of the State of Oklahoma.
(Morgan’s App’x, Vol. 1 at 179 (emphasis added).) The instruction further stated: “A person acts corruptly when that person acts with the understanding that something of value is to be offered or given to influence him in connection with his official duties.” (Id. at 180 (emphasis added).) It also provided: “[W]hen payments are accepted by a public official from a payor with the intent to obtain that official’s actions on an ‘as needed’ basis, so that when the opportunity presents itself that public official takes official action on the payor’s behalf in return for those payments, that constitutes bribery.” (Id. at 180-81 (emphasis added).)
*434 In his motion' for new trial, Morgan argued the latter two instructions erroneously described the payor’s intent not the recipient’s and therefore improperly allowed the jury to convict him if it concluded merely that he had knowledge of Crosby’s corrupt intent, even absent any corrupt intent on his part. Stated differently, the jury may have based his conviction on Crosby’s corrupt intent, not his own. The trial court rejected this argument because Morgan’s arguments focused on very narrow portions or phrases of the instructions, rather than considering them as a whole.[18] When properly considered, the instructions fairly and correctly stated the applicable law. But if the supplemental instructions were erroneous, the court concluded, the error did not “so seriously affect the fairness, integrity, or public reputation of the judicial proceedings that the Court should grant a new trial.” (Morgan’s App’x, Vol. 2 at 533.)
Morgan now reiterates the arguments made in the trial court, relying on a Second Circuit decision, United States v. Ford, 435 F.3d 204 (2d Cir.2006). Ford was an officer of a state employees’ union that received federal funds. Id. at 206. The bribery charge against her alleged she accepted free media services for her reelection campaign and, in return, she steered overpriced union work to the media services provider. Id, Ford objected to the district court’s instruction, which stated in relevant part: “A person acts corruptly when the person acts with the understanding that something of value is to be offered or given to influence her in connection with her organizational duties.” Id. at 211 (quotations omitted). The appellate court reversed Ford’s conviction because the instruction “appear[ed] to have told the jury that the ‘corruptly[1] requirement was fully satisfied by [Ford’s] knowledge of the donor’s intent and omitted any reference to [Ford’s] intent in accepting the thing of value____” Id.
Morgan’s situation is easily distinguished from Ford’s. Here the court told the jury it could not convict unless it found, beyond a reasonable doubt, that Morgan demanded or accepted his retainer fees “with the intent to be influenced in connection with some business, transaction, or series of transactions of the State of Oklahoma.”[19] (Morgan’s App’x, Vol. 1 at 179 (emphasis added).) Although the supplementary language, standing alone, may have been ill-advised in this case, the *435 instructions as a whole could not have misled or confused the jury regarding the government’s burden of proof. See United States v. Smith, 13 F.3d 1421, 1424 (10th Cir.1994) (“Only where the reviewing court has substantial doubt that the jury was fairly guided will the judgment be disturbed.”) (quotations omitted). There was no error,

C. Tacit Agreements

Prior to Morgan’s trial, Crosby was arrested and charged with bank fraud. The bank fraud scheme involved Crosby submitting invoices to a bank which falsely alleged that he had purchased cattle. The invoices allowed Crosby to draw on the line of credit he had with the bank. He also sold the cattle he had used to secure the line of credit without notifying the bank and kept the proceeds. Pursuant to a plea agreement, he pled guilty to one count of making a false statement to a bank. The government disclosed the investigation documents, the charge, and the subsequent plea agreement to the defense. The disclosure revealed the participation of Crosby’s daughter who accepted some cattle from him and then gave her father the proceeds after she sold them in her own name. The disclosure also included allegations, in the form of an affidavit from one of the victims, that Crosby fraudulently sold securities in the form of “Preferred Membership Interests” (PMIs) in 2005.[20] (Morgan’s App’x, Vol. 1 at 340.) During jury selection, the defense requested Crosby’s presentence report (PSR), which the government supplied (with the court’s permission). The report included information about Crosby’s bank fraud scheme, his daughter’s involvement, and the loans he received from various individuals in the form of PMIs.[21] Despite these disclosures, Morgan sought an evidentiary hearing and, in a motion for a new trial, claimed the government failed to disclose tacit agreements it made with Crosby in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and knowingly presented false evidence in violation of Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).
*436 The court denied Morgan’s requests. It determined the government timely provided all relevant material. Further, it concluded any undisclosed agreements, if they existed, were immaterial because defense counsel fully addressed Crosby’s credibility at trial and additional information would not change the result. •
Morgan repeats his trial court arguments here. He claims the government knew Crosby was subject to significant additional criminal charges, including bribery (this case), securities fraud, money laundering, and mail fraud. Further, it knew Crosby’s daughter was involved in the bank fraud scheme. In addition, Morgan contends Crosby lied about his assets, employment, and income in his presen-tence investigation interview. According to Morgan, the government’s failure to prosecute either Crosby or his daughter for any of this conduct should inescapably lead one to conclude the government agreed to much more than was stated in Crosby’s plea agreement. He further claims the government’s failure to seek forfeiture of the assets Crosby received from his criminal activities demonstrates an undisclosed tacit agreement not to do so.
Finally, Morgan maintains the government allowed false testimony to go uncorrected at trial. Crosby’s plea agreement stated it protected him only from prosecution for false statements to the bank from January 2003 through June 2008 (bank fraud) and “does not provide any protection against prosecution for any crime not specifically described above.” (Morgan’s App’x, Vol. 7 at 2729.) The agreement further provided: “[Tjhis document contains the only terms of the agreement concerning [Crosby’s] plea of guilty in this case and that there are no other deals, bargains, agreements, or understandings that modify or alter these terms.” (Id. at 2730.) Morgan argues these assertions were false because there were other deals the government was well aware of and it failed to correct the contrary false statements to the jury.[22] Morgan also faults the government for not fully explaining the agreement’s statement: “It is the expectation of the United States that its criminal investigation of the defendant’s conduct (as opposed to the wrongdoings of others) will cease upon the signing of this plea agreement.”[23] (Id. at 2723.)
*437 But, except for his claim about Crosby’s lies during his presentence interview, Morgan knew prior to trial (from the government’s disclosures) about the underlying facts he now suggests prove tacit agreements. He could have cross-examined Crosby on these issues but did not. He chose instead to focus on Crosby’s need to cooperate in this case in order to avoid a harsh sentence in his bank fraud case. While he may have had a tactical reason for not inquiring further, Morgan, in fact, had the information and could have used it rather than lying behind the log in order to create issues for appeal. In any event, he has failed to establish that either a Brady or Napue violation occurred.
Brady “established the principle that criminal convictions obtained by ... suppression of exculpatory or impeaching evidence violates the due process guarantees of the Fourteenth Amendment.” Douglas v. Workman, 560 F.3d 1156, 1172 (10th Cir.2009). “The government’s obligation to disclose exculpatory [or impeaching] evidence does not turn on an accused’s request” and “the duty to disclose such information continues throughout the judicial process.” Id. at 1172-73.
“Brady requires disclosure of tacit agreements between the prosecutor and a witness. A deal is a deal — explicit or tacit. There is no logic that supports distinguishing between the two.” Douglas, 560 F.3d at 1186; see also Bell v. Bell, 512 F.3d 223, 233 (6th Cir.2008) (en banc). “A conviction based on testimony implicating concealed incentives to an important witness is potentially tainted.” Cargle v. Mullin, 317 F.3d 1196, 1216 (10th Cir.2003). “[Particularized impeachment through possible biases, prejudices, or ulterior motives arising in connection with as-yet uninitiated or uncompleted criminal prosecution” may be important because it suggests "why the witness might by lying.” Id. at 1215 & n. 18 (quotations omitted). “And such impeachment increases in sensitivity in direct proportion to the witness’s importance to the state’s case.” Id. at 1215 (quotations omitted).
Under Napue, “criminal convictions obtained by presentation of known false evidence” also violate due process. Douglas, 560 F.3d at 1172; see also Giglio v. United States, 405 U.S. 150, 153, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (“[Deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice.”) (quotations omitted). “The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.” Douglas, 560 F.3d at 1172 (quoting Napue, 360 U.S. at 269, 79 S.Ct. 1173).
Crosby was the 'key witness for the government as to Count 63. But Morgan merely speculates about undisclosed tacit agreements prior to his trial. He points to no solid evidence of any such agreement. The government’s failure to prosecute either Crosby or his daughter or to seek civil forfeiture of his assets is simply not enough. See Jefferson v. United States, 730 F.3d 537, 552 (6th Cir.2013) (“[T]he fact that both [witnesses] were not prosecuted for particular crimes, without more, is insufficient .., to establish that an undisclosed deal existed.”).
The cases relied on by Morgan illustrate this point. Each'case involved evidence demonstrating an undisclosed agreement was reached between the government and a witness prior to trial. For example, in *438 Cargle, the witness to a murder was promised immunity in exchange for his testimony. 317 F.3d at 1214. However, a few years before the trial, the witness had been given a deferred sentence on an assault charge. ■ Id. His current involvement in the murder would have “expos[ed] him to an immediate sentence of up to twenty years’ imprisonment on the pre-existing assault conviction.” Id. “When [later] asked by an investigator ... whether non-acceleration of the deferred sentence had been a (tacit) part of his agreement to testify in petitioner’s case, [the witness] admitted that he had received an assurance from the district attorney that nothing would come up in court about the deferred sentence.” Id. at 1215 (emphasis added). We concluded “there evidently was an additional, and quite significant, quid pro quo for [the witness’s] cooperation, which was not recited in the [immunity] agreement and never disclosed to the jury.” Id. at 1214.
Similarly, in Douglas, the witness testified at two murder trials and “provided] the only direct evidence linking [the defendants] to the murder.” 560 F,3d at 1174. After the trials, the witness executed a handwritten affidavit recanting his trial testimony and “asserting that he had received the [prosecutor’s] assistance in exchange for his testimony, contrary to his denials at both trials.” 560 F.8d at 1167. We agreed with the district court that the prosecutor’s failure to disclose his deal with the witness violated Brad/y and the violation was material. Id. at 1175; see also LaCaze v. Warden La. Carr. Inst. for Women, 645 F.3d 728, 735-86 (5th Cir.) (witness claimed he repeatedly received assurances his son would not be prosecuted prior to implicating defendant), amended by 647 F.3d 1175 (5th Cir.2011); Harris v. Lafler, 553 F.3d 1028, 1030-31 (6th Cir.2009) (witness testified the police promised he and his girlfriend would be released from custody if he implicated defendant); Graves v. Dretke, 442 F.3d 334, 340-44 (5th Cir.2006) (prosecutor informed media five years after trial that star witness had admitted prior to trial that he had acted alone in murders yet prosecutor had failed to reveal this information to defendant; the witness’s trial testimony had the defendant involved in the murders).
Unlike Cargle, Douglas, and the other cases relied upon by Morgan, neither Crosby nor the government has admitted to Crosby having been promised anything other than that to which he testified at trial — hopes for a lenient sentence in his bank fraud case.
Morgan also relies on United States v. Shaffer, 789 F.2d 682 (9th Cir.1986). Shaffer was convicted of drug and income tax violations, 789 F.2d at 684. The court affirmed Shaffer’s entitlement to a new trial due to, inter alia, “the government’s failure to disclose that [the key trial witness] did in fact have assets which were acquired through drug profiteering (i.e., a house in Palm Springs and funds to enter a health spa).” Id. at 689. It said this nondisclosure “coupled with the government’s failure to initiate asset forfeiture proceedings to acquire these assets, implies that a tacit agreement was reached between [the witness] and the government that allowed [the witness] to avoid any asset forfeiture liability in exchange for his cooperation.” Id. The court rejected the government’s argument that “because there was no explicit agreement [on the forfeiture issue], it had nothing to disclose”: “While it is clear that an explicit agreement would have to be disclosed because of its effect on [the witness’s] credibility, it is equally clear that facts which imply an agreement would also bear on [his] credibility and would have to be disclosed.” Id. at 690.
*439 Morgan claims the government failed to disclose Crosby’s lies during his presen-tenee interview, much like the government’s nondisclosure in Schaffer. But Morgan discovered the claimed misrepresentations after he conducted his own investigation and does not elaim (let alone demonstrate) the government was aware of the lies during the relevant time.
Evidence of misrepresentation or misleading on the part of the government is lacking and Morgan has failed to provide evidence of an agreement.[24] Instead, he merely speculates about a possible agreement based on the government’s charging decisions. Speculation is not enough. “Without an agreement, no evidence was suppressed, and the state’s conduct, not disclosing something it did not have, cannot be considered a Brady violation.” Bell, 512 F,3d at 234 (quotations omitted).
We see no violation of Napue, which prohibits the presentation of known false evidence to the jury. Because Morgan has provided no evidence of any other deals, he has hot demonstrated Crosby’s trial testimony concerning his plea agreement and the absence of any other deals was false.
Not only that, but Morgan had the relevant facts from the government which he now uses to assign a sinister motive to the government. He could have inquired more thoroughly about those facts on cross-examination and let the jury decide the credibility issue rather than saving it for appeal.
IY. Government’s Cross-Appeal
The PSR determined Morgan’s base offense level to be 14. See USSG § 201.1(a)(1). Two relevant conduct points were added because the offense involved more than one bribe (Silver Oak, Dilworth, Tenaska, and three other clients) and fourteen points were added because the payments received from the six bribes totaled $684,164.52.[25] . See USSG §§ 2Bl.l(b)(l)(H), 201.1(b)(1), (2). Another four points were added under USSG § 201.1(b)(3) because “the offense involved an elected public official or any public official in a high-level decision-making or sensitive position.” The offense level was adjusted upward two levels for obstruction of justice based on Morgan’s false trial testimony concerning his dealings with Silver Oak. See USSG § 3C1.1. These enhancements and adjustments resulted in a total offense level of 36, With a criminal history category of I, the PSR calculated an advisory guideline range of 188 to 235 months imprisonment. However, the sentence was capped at the statutory maximum — 120 months.
Morgan objected to the relevant conduct determination and the upward adjustment for obstruction of justice. He also flooded the court with letters praising his character, noting his contributions to the community, and seeking leniency. He requested a sentence of probation.
The district court sustained Morgan’s relevant conduct objection.- Although it concluded the schemes concerning the *440 other clients qualified as relevant conduct under USSG § 1B1.3, it decided the government had failed to prove by a preponderance of the evidence that any conduct relating to Dilworth, Tenaska, or the other clients was illegal. Relying primarily on the testimony making it neither illegal nor unethical for an attorney to charge retainer fees without performing legal work, the court reasoned: “There is certainly a view you could take that would indicate that Mr. Morgan knew what he was doing was wrong and that it was wrong. There is an equally persuasive view, in my opinion, that everything he did was right and not illegal.” (Government’s Supp. App’x, Vol. 3 at 1233.) Thus, it concluded all sentencing guideline calculations had to be based solely on the offense of conviction (no consideration of relevant conduct). It also sustained Morgan’s objection to the obstruction of justice adjustment, concluding there was “a view of Mr. Morgan’s testimony that ... it is all entirely correct and honest and still be consistent with the other evidence and with the jury’s verdict on Count 63.” (Id. at 1235.) These rulings resulted in a total offense level of 22 and an advisory guideline range of 41 to 51 months imprisonment.
But the court went even further, varying downward and sentencing Morgan to five years of probation (no incarceration). It also ordered him to complete 104 hours of community sendee during the first year of probation and entered a forfeiture money judgment in the amount of $12,000 but imposed no fine. It explained its decision as follows:
Of course, I start with the calculation of the guideline range and then go on to consider what sentence is enough but no more than necessary to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.
In your case, I see no need in sentencing to protect the public. This is your first introduction to the criminal justice system, and I don’t think there’s anything in your background that would indicate that you would have another one. I just think that is a nonfactor of this list of factors.
Now, I think that the need to provide you with educational or vocational or medical treatment is also a nonfactor.
So in this case, I look at the seriousness of the offense, adequate deterrence not only for you but for others, and promoting respect for the law.
I beg[i]n with my view of the evidence. I sat through this, as did the' jury, and I had definite opinions about the evidence that I don’t get to voice when the jury does, but you were convicted on only one of 63 counts.
One of the many letters submitted [o]n your behalf suggested that I figure out what your sentence should be — I suppose under the guidelines — and then divide it by 63 to come up with a fair sentence. I actually thought that was not such a bad idea, but I could not figure out the math to do it.
But, clearly, you were charged with a lot, you were convicted with very little. And that conviction, as [defense counsel] has pointed out today, was based on some very suspect evidence, based on the testimony of a convicted felon, resulting in a bill that no one has ever complained about.
So in this case I’m looking at the harm that was done. Certainly the harm is always to the reputation of legitimate state government. That suffers many places, sometimes in Oklahoma more than others. And that’s certainly a value to be respected and for which punishment should be meted out.
*441 I look at this book of letters. I’ve thought often, I don’t think that I would know 482 people to even ask for a letter, much less get a positive one from all of them back. You are well loved in the community and many communities.
And so many of these people have asked for consideration of probation or other leniency [o]n your behalf.
The one thing that [the prosecutor] argues in favor a sentence of imprisonment is an important one, and that is example to others who may be inclined to try to do what you have done.
I am personally of the opinion that the publicity that has followed this case from the beginning, the results to you both in your health, your financial health, the fact that you will almost certainly lose your license to practice law, I think all of these are factors that would surely deter anyone else considering the same conduct.
For all these reasons, I am varying downward from the guideline range and imposing a sentence of probation.
(Government’s Supp. App’x., Vol. 3 at 1246-48.) The government appeals from the incarceration-free sentence, charging it to be substantively unreasonable.

A. Standard of Review

Five years of probation imposed in the face of the 41 to 51 months of incarceration recommended by the guidelines (as calculated by the judge), the government says, is substantively unreasonable when measured against the factors set out in 18 U.S.C. § 3553(a).[26] It asserts the court failed to address two of its arguments — the need for the sentence imposed to (1) provide adequate deterrence and (2) avoid unwarranted sentencing disparities. It focuses on the former as the most important factor in sentencing elected officials in public corruption cases like this one. It also points to the court’s reliance on two impermissible factors — the court’s doubts about the jury’s guilty verdict and its conclusion that Morgan was sufficiently punished by negative publicity and other collateral consequences (the loss of his law license and deterioration of his physical and financial health). Finally, it says the court placed unreasonable reliance on the volume of supportive letters (literally hundreds).
Not surprisingly, Morgan takes a different view. He acknowledges deterrence to be a factor warranting consideration but not, as the government alleges, the most important one. He also distinguishes the cases the government relies on to show his sentence results in unwarranted sentencing disparities. According to Morgan, the court properly considered the collateral consequences of his conviction and the letters of support under § 3553(a)(1) — “the nature and circumstances of the offense and the history, and characteristics of the *442 defendant.” Morgan relies heavily on the deferential abuse of discretion standard of review applied to sentencing decisions, claiming no such abuse occurred here.
Since United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), we review sentences for reasonableness— “a two-step process comprising a procedural and a substantive component.” United States v. Friedman, 554 F.3d 1301, 1307 (10th Cir.2009) (quotations omitted). We begin with the procedural component to determine whether there is error in the district court’s calculation or explanation of the sentence. Gall v. United States, 552 U.S. 38, 51, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007). Procedural error includes incorrectly calculating or failing to .calculate a guidelines sentence, treating the guidelines as mandatory rather than discretionary, failing to consider the statutory sentencing factors from § 3553(a), relying on clearly erroneous facts, or failing to adequately explain the sentence. Id. “[A] major [variance from the guideline range] should be supported by a more significant justification than a minor one.” Id. at 50, 128 S.Ct. 586. “Review for substantive reasonableness focuses on whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a).” Friedman, 554 F.3d at 1307 (quotations omitted). Although the government couches all of its arguments as challenges to the substantive reasonableness of Morgan’s sentence, some of its specific claims relate to the court considering impermissible factors and failing to address two of its arguments. Both of those arguments relate to the procedural reasonableness of the sentence. See United States v. Lente, 647 F.3d 1021, 1031-32 (10th Cir.2011); United States v. Smart, 518 F.3d 800, 803-04 (10th Cir.2008). Thus, we first consider whether the court committed procedural error.

B. Procedural Reasonableness

Because the government did not preserve its procedural reasonableness argument in the trial court, we review it for plain error.[27] United States v. Lucero, 747 F.3d 1242, 1246 (10th Cir.2014). “Under this standard, we will only vacate the sentence if: (1) there is error; (2) that is plain; (3) that affects substantial rights, or in other words, affects the outcome of the proceeding; and (4) substantially affects the fairness, integrity, or public reputation of judicial proceedings.” ' Id. (quotations omitted). This is a difficult standard to meet. United States v. Rosales-Miranda, 755 F.3d 1253, 1258 (10th Cir.2014). But, “while difficult to overcome, [the plain error standard] serves an important goal: to *443 balance our need to encourage all trial participants to seek a fair and accurate trial the first time around against our insistence that obvious injustice be promptly redressed.” Id. (quotations omitted). “Accordingly, we will find plain error only when an error is particularly egregious and the failure to remand for correction would produce a miscarriage of justice.” Id. (quotations omitted). This onerous standard is satisfied here.
The jury returned a unanimous verdict finding Morgan willingly traded on his legislative status for pecuniary gain and disguised the bribery payments as legal fees. The court’s sentence, at least in part, was based on its view that Morgan’s conviction resulted from “very suspect evidence, based on the testimony of a convicted felon, resulting in a bill that no one has ever complained about.”[28] (Government’s Supp. App’x, Vol. 3 at 1247.) Morgan maintains the court may properly consider the weight of the evidence as part of the nature of the offense. The government contends these comments show the court disagreed with the verdict which led to an unreasonably lenient sentence. It is correct.
The court cannot substitute “its view of the evidence ... for the jury’s verdict.” United States v. Bertling, 611 F.3d 477, 481 (8th Cir.2010). “Once the jury has spoken, its verdict controls unless the evidence is insufficient or some procedural error occurred; it is both unnecessary and inappropriate for the judge to reexamine, and resolve in the defendant’s favor, a factual issue that the jury has resolved in the prosecutor’s favor beyond a reasonable doubt.” United States v. Rivera, 411 F.3d 864, 866 (7th Cir.2005); see also United States v. Hunt, 521 F.3d 636, 649 (6th Cir.2008) (“[I]t would be improper for the judge in sentencing to rely on facts directly inconsistent with those found by the jury beyond a reasonable doubt.”); United States v. Curry, 461 F.3d 452, 461 (4th Cir.2006) (“The court erred .., in sentencing [the defendant] based on a conclusion that contravened the jury’s verdict.”). A district court’s “considerable discretion” to consider “the nature and circumstances” of the offense under § 3553(a)(1) “does not extend to nullifying the jury’s verdict.” Bertling, 611 F.3d at 482 (quotations omitted).
Morgan argues the jury nullification cases are not relevant here because “the District Court never said that Morgan was not guilty” and in fact denied his motion for judgment of acquittal. (Morgan’s Reply and Responsive Br. at 40.) That is correct as far as it goes, but the legitimacy of the sentence unravels when the record shows the court’s doubts about the verdict leaked into the sentencing decision. The court’s comment that it sat through the jury trial and “had definite opinions about the evidence that [it did not] get to voice when the jury [did],” in conjunction with its comment that the evidence was “suspect,” reveal considerable doubts about the propriety of the jury’s verdict.[29] (Government’s Supp. App’x., Vol. 3 at 1246-47.)
*444 Words are important. We have no doubt “a reasonable observer, hearing or reading the quoted remarks, might infer, [even if] incorrectly,” that the court’s estimation of the evidence, contrary to the jury’s, played a role in Morgan’s sentence. United States v. Leung, 40 F.3d 577, 586-87 (2d Cir.1994). Its remarks differ from mere passing reference. Indeed, they appear, quite clearly, to be a significant reason for its drastic and unreasonable variance from the guideline recommendation.
Similarly, the court erred in determining Morgan was adequately punished by the heightened publicity the case received and the loss of his law license and physical and financial health as a result of his prosecution and conviction.[30] Generally, there is “no limitation ... on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.” United States v. Pinson, 542 F.3d 822, 836 (10th Cir.2008) (quotations omitted). “It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every ease as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.” Gall, 552 U.S. at 52, 128 S.Ct. 586 (quotations omitted). On the other hand, the words of the First Circuit vibrate with thunderous resonance: “[I]t is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction.” United States v. Prosperi, 686 F.3d 32, 47 (1st Cir.2012); see also 28 U.S.C. § 994(d) (requiring the sentencing guidelines to be “entirely neutral as to the ... socioeconomic status of offenders”); USSG §§ 5H1.2 (“[education and vocational skills are not ordinarily relevant in determining whether a departure is warranted”), 5H1.5 (“[e]mployment record is not ordinarily relevant in determining whether a departure is warranted”), 5H1.10 (socioeconomic status is “not relevant in the determination of a sentence”).
Take, for example, United States v. Bistline, where the defendant pled guilty to knowingly possessing child pornography. 665 F.3d 758, 760 (6th Cir.2012). Bistline was sentenced to a single night’s confinement in the courthouse lockup and a ten-year period of supervised release even though the advisory guideline range was 63 to 78 months imprisonment. Id. The judge relied in part on certain collateral consequences of his conviction, including the requirement for him to register as a sexual offender and “the publication of that registration to the community and to his friend and neighbors.” Id. at 765 (quotations omitted). The Sixth Circuit saw it as error:
[Section] 3553(a)(2)(A) plainly states that “the sentence imposed” should “reflect the seriousness of the offense,” (emphasis added); and none of these things are Bistline’s sentence. Nor are they consequences of his sentence, as opposed to consequences of his prosecution and conviction. The district court’s recitation of these collateral consequences therefore does nothing to show that Bistline’s sentence reflects the seriousness of his offense. Were it otherwise, these sorts of *445 consequences — particularly ones related to a defendant’s humiliation before his community, neighbors, and friends— would tend to support shorter sentences in cases with defendants from privileged backgrounds, who might have more to lose along these lines. And “[w]e do not believe criminals with privileged backgrounds are more entitled to leniency than those who have nothing left to lose.” United States v. Stall, 581 F.3d 276, 286 (6th Cir.2009).
Id. at 765-66.
More recently, the Sixth Circuit reiterated this sentiment in a bank and wire fraud case where the district court ignored a guideline range of 57 to 71 months imprisonment to impose essentially none.[31] See United States v. Musgrave, 761 F.3d 602, 604 (6th Cir.2014). In fashioning the sentence, “the district court relied heavily on the fact that Musgrave had already ‘been punished extraordinarily’ by four years of legal proceedings, legal fees, the likely loss of his CPA license, and felony convictions that would follow him for the rest of his life.” Id. at 608. But the Sixth Circuit saw it for what it was, favoritism for the elite. The consequences of Mus-grave’s prosecution and conviction were impermissible factors to be considered: “None of these things are his sentence. Nor are they consequences of his sentence; a diminished sentence based on these considerations does not reflect the seriousness of his offense or effect just punishment.” Id. at 608 (quotations omitted); see also United States v. Kuhlman, 711 F.3d 1321, 1329 (11th Cir.2013) (“The Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status.”).[32]
And, as the Seventh Circuit has aptly stated:
[N]o “middle class” sentencing discounts are authorized. Business criminals are not to be treated more leniently than members of the “criminal class” just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity. It is natural for judges, drawn as they (as we) are from the middle or upper-middle class, to sympathize with criminals drawn from the same class. But in this instance we must fight our nature. Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.
United States v. Stefonek, 179 F.3d 1030, 1038 (7th Cir.1999) (citation omitted).
We agree with the reasoning of the Sixth, Seventh, and Eleventh Circuits. By considering publicity, loss of law license, and deterioration of physical and financial health as punishment, the court impermis-sibly focused on the collateral consequences of Morgan’s prosecution and conviction. But § 3553(a)(2)(A) requires “the *446 sentence imposed ... to reflect the seriousness of his offense.” (Emphasis added). None of these collateral consequences are properly included in Morgan’s sentence. They impermissibly favor criminals, like Morgan, with privileged backgrounds. And, paradoxically, in this case they favor a popular politician who corruptly sold influence, not only violating the law but also betraying solemn obligations and the public’s trust, and who misused his license to practice law in concealing the bribes.
As to the government’s claim that the court failed to consider the need for adequate deterrence and to avoid unwarranted sentencing disparity, we disagree as to the former but agree as to the latter. While, as we will explain, its weighing of the deterrence factor amounted to substantive error, it did expressly consider it. There was no procedural error as to that. See Lente, 647 F.3d at 1031-32. In contrast, it did not account for the need to avoid unwarranted sentencing disparity, despite the government having raised this “material, non-frivolous” issue. Id. at 1035. This constitutes procedural error. Id.
The next question is whether the procedural errors we have identified are plain. To be plain, “[an] error must be clear or obvious” under “current, well-settled law.” United States v. Story, 635 F.3d 1241, 1248 (10th Cir.2011). Generally, “for an error to be contrary to well-settled law, either the Supreme Court or this court must have addressed the issue.” Id. (quotations omitted). “However, in certain circumstances, the weight of authority from other circuits may make an error plain even absent a holding from this court or the Supreme Court.” United States v. Hill, 749 F.3d 1250, 1258 (10th Cir.2014) (quotations omitted). But “if neither the Tenth Circuit nor the Supreme Court has ruled on the subject, we cannot find plain error if the authority in other circuits is split.” Story, 635 F.3d at 1248-49 (10th Cir.2011) (quotations omitted). “This general rule, however, is most persuasive where the explicit language of a statute or rule does not specifically resolve an issue.” United States v. Edgar, 348 F.3d 867, 871 (10th Cir.2003) (quotations omitted) (finding error to be plain where federal rule of criminal procedure specifically resolved issue).
The procedural errors in this case were plain. Admittedly, neither this Court nor the Supreme Court has addressed a case (until now) where a court varied downward in large part due to its disagreement with the jury’s verdict. Yet, the weight of authority from other circuits has found these circumstances to amount to error. Moreover, even absent any precedent, it is quite clear a court’s consideration of “the nature and circumstances of the offense” under § 3553(a)(1) does not permit effectively voiding the consequences necessarily attending the jury’s verdict.[33]
The erroneous consideration of the collateral consequences of a prosecution and conviction as punishment was also clear and obvious. Again, neither this Court nor the Supreme Court has addressed the *447 issue. And, while the Sixth, Seventh, and Eleventh Circuits have found consideration of consequences favoring middle- or upper-class defendants to be error, the Second Circuit has not. See supra n.S2. Nevertheless, the answer is made clear under the explicit language of 28 U.S.C. § 994(d) as well as the policy statements of the guidelines. See USSG §§ 5H1.2, 5H1.5, 5H1.10.
Finally, § 3553(a)(6) expressly requires the sentencing court to consider the need to avoid unwarranted sentencing disparities and the government argued that point. A court commits procedural error when it does not consider a “material, non-frivolous” argument raised by a party. See Lente, 647 F.3d at 1035.
We next consider whether the government has shown these errors affected the outcome of the proceedings (third factor). According to Morgan, even if the court had not considered the improper factors and had considered the need to avoid unwarranted sentencing disparities, the result would have been the same. Not hardly. The court’s view of the evidence and its belief Morgan had been adequately punished by collateral consequences played an obvious and significant role in the sentencing decision. Had the court properly calibrated the need for the sentence to avoid unwanted sentencing disparities it would have arrived at a sentence of imprisonment. Morgan received a lenient sentence because of damage to his privileged status. But his crime was a corrupt misuse of that very status. Would a beat cop or minor government functionary ever be afforded such extraordinary consideration?
Even if the errors are plain and affected substantial rights, we have the discretion to leave them uncorrected. Rosales-Miranda, 755 F,3d at 1258. We may only correct plain error affecting substantial rights if we also conclude that not doing so would “seriously affect[] the fairness, integrity, or public reputation of judicial proceedings.” Id. (quotations omitted). This standard is easily met here. More than the personalities involved, this case is about public trust in the fairness and integrity of government. Also at stake is the collective reputation of all elected officials, particularly those at the pinnacle of power and prestige. What happens when that public trust is abused by corrupt acts? The offender’s reputation is sullied and with it the reputation of honest and stalwart public servants. The judicial response to demonstrated corruption by the political elite and the lapse of duty, honor, and integrity it represents is as important as the corruption itself. The great orator Daniel Webster was both revered and reviled for his politics. But institutional commitment to honest government is captured in these words: “I would invoke those who fill the seats of justice, and all who minister at her altar, that they execute the wholesome and necessary severity of the law.” Daniel Webster’s Plymouth Oration, Plymouth, Massachusetts (Dec. 22,1820). Lest the fairness, integrity, and public reputation of judicial proceedings suffer we must, dispassionately, meet the challenge. Harm to the public’s trust in its government may be immeasurable, but that does not make it inestimable. The harm is profound by any rational estimate. Leaving intact a sentence of probation (when the guidelines recommend substantial imprisonment) based on the denigration of a jury’s verdict, considering an improper factor, and failing to consider a critical factor is “particularly egregious.” Our failure to correct these errors would surely be “a miscarriage of justice.” Id.
Having found plain procedural error, we would normally remand without considering the substantive reasonableness of the sentence. See United States v. Haggerty, *448 731 F.3d 1094, 1101 n. 6 (10th Cir.2013); United States v. Tom, 494 F.3d 1277, 1282 (10th Cir.2007). But because we easily conclude the sentence is substantively unreasonable, and in this case intolerable, we address it.[34]

C. Substantive Reasonableness

“Review for substantive reasonableness focuses on whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a).” Friedman, 554 F.3d at 1307 (quotations omitted). Our review is for an abuse of discretion.[35] Gall, 552 U.S. at 51, 128 S.Ct. 586. “A district court abuses its discretion when it renders a judgment that is arbitrary, capricious, whimsical, or manifestly unreasonable.” United States v. Munoz-Nava, 524 F.3d 1137, 1146 (10th Cir.2008) (quotations omitted). We “must give due deference to the district court’s decision that the § 3553(a) factors, on a whole, justify the extent of the variance. The fact that [we] might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court.” Id. (quotations omitted).
Nevertheless, “appellate review continues to have an important role to play and must not be regarded as a rubber stamp.” Pinson, 542 F.3d at 836; see also United States v. Abu Ali, 528 F.3d 210, 266 (4th Cir.2008) (“[I]nherent in the concept of ‘reasonableness’ is the notion that the rare sentence may be unreasonable, and inherent in the idea of ‘discretion’ is the notion that it may, on infrequent occasion, be abused.”) (citation omitted). “In sentencing, as in other areas, district judges at times make mistakes that are substantive. At times, they will impose sentences that are unreasonable. Circuit courts exist to correct such mistakes when they occur.” Rita v. United States, 551 U.S. 338, 354, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007); see also Friedman, 554 F.3d at 1302, 1308-12 (finding sentence of 57 months imprisonment, where advisory guideline range was 151 to 188 months, substantively unreasonable). This case cries out for appellate intervention.
Removing consideration of the improper factors (doubts about the jury’s guilty verdict and consideration of the collateral consequences of a prosecution and conviction as sufficient punishment), the court’s decision to vary downward to probation was based on the following: (1) seriousness of the offense, (2) the letters of support, and (3) deterrence. Properly viewed, these factors, even cumulatively, do not support the gross variance from the guidelines this sentence presents.
The court paid only lip service to the seriousness of the offense and its harm to the reputation of honest public servants and the public faith in legitimate state government. Instead, its explanation of a “fair sentence” might be one reached by first calculating the guideline sentence based on the crime of conviction (Count 63) and then dividing it by 63, the total number of counts, including the mistried and acquitted counts relating to Dilworth and Tenaska. (Government’s Supp. App’x, *449 Vol. 3 at 1247.) In doing so, it used the mistried and acquitted counts to mitigate Morgan’s punishment on the count for which he was convicted. That is clearly improper. If anything, these counts should have been considered as aggravating the seriousness of the offense.[36] It is improper, as well as illogical, to think acquittals on some counts somehow ameliorate guilt on convicted counts. It is worse to so treat the mistried counts. At first blush it might appear that the government' concurred in the trial court’s assessment as to the 28 counts against Morgan for which the jury could not reach a verdict. Close analysis reveals that first blush to be a faint one. The jury reached its verdict on March 5, 2012. The government was apparently satisfied with its partial victory and decided, for whatever reason, not to retry those counts. It moved to dismiss them on March 10, 2012; the motion was granted five days later. Had it been able to anticipate the probation sentence, imposed ten months later, on January 8, 2013, it may have made a different choice. We cannot second guess the exercise of prosecutorial discretion, and will not presume the dismissal in any way suggests Morgan’s innocence or that the government lost faith in the propriety of those counts. Morgan claims the court’s comments were said in jest. That may be true. But the court also pointed out separately that Morgan had been “charged with a lot [but] convicted with very little.” (Government’s Supp. App’x, Vol. 3 at 1247.)
The court also placed undue emphasize on the numerous letters written in support of leniency. As the government concedes, the court could and should consider the letters sent by Morgan’s supporters. But a review of those letters reveals many to suffer from the same flaws inherent in the court’s sentencing analysis (outlined above) — many of the authors questioned Morgan’s guilt or did not know the facts surrounding the offense while others believed Morgan had been adequately punished by the collateral consequences of his prosecution and conviction. The number of letters was certainly impressive but not *450 surprising. As the government aptly points out: “One does not become President Pro Tern without the confidence of many supporters, some quite influential,” (Government’s Opening Br. at 80.) The letters must be viewed in that light.
While the court did consider the need for adequate deterrence, it did so by improperly relying on the collateral consequences flowing from the prosecution and conviction. Assuming, arguendo, that it was proper to consider these collateral consequences as specific deterrents to further criminal behavior by Morgan (as opposed to sufficient punishment), we fail to see how they suffice to satisfy the need for general deterrence. True, Morgan’s prosecution and conviction were highly publicized in Oklahoma. But in the court’s words he remained “well loved in the community and many communities.” (Government’s Supp. App’x, Vol. 3 at 1247.) Obviously, the publicity accompanying his trial and conviction would not necessarily deter other elected officials from similar conduct. Moreover, Morgan’s health conditions (anxiety/depression and exacerbation of his pre-existing high blood pressure) seem to be temporary in nature and would not be known by other public officials. Similarly, the loss of a law license generally would not be applicable to a majority of elected officials and considering it to be a deterrent represents a loss of focus; Morgan used his law license to facilitate his criminal act. Cfi Stefonek, 179 F.3d at 1038 (district court erred in departing downward based on services defendant had rendered to community as a nurse because services were “provided by the very businesses that were the vehicle of [defendant’s] multiple violations of federal law”). Moreover, Morgan is in the twilight of his legal career, making the loss of the privilege of practicing law in Oklahoma less devastating. As to the financial hardship Morgan incurred as a result of his trial and conviction, the record shows he lost the majority of his income between 2008, the year he left the Oklahoma Senate, and 2009. Thus, his greatest drop in income occurred when he could no longer profit from his political position and long before he began to incur legal fees.
Properly considering general deterrence, we fail to see how a non-custodial sentence would deter public officials from soliciting bribes. General deterrence comes from a probability of conviction and significant consequences. If either is eliminated or minimized, the deterrent effect is proportionately minimized. This country depends on honest representative democracy and, while our system is imperfect, it does not generally suffer from widespread corruption. Its proper functioning requires elected officials to serve the common good, not illicit personal gain. Our citizens place faith in the honesty and integrity of elected officials. Without meaningful- consequences for a breach of trust, their trust is no more than blind trust. Congress has recognized as much. Deterrence is a crucial factor in sentencing decisions for economic -and public corruption crimes such as this one:
The second purpose of sentencing is to deter others from committing the offense. This is particularly important in the area of white collar crime. Major white collar criminals often are sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business.
S.Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182,3259.
Thus, “one of the primary objectives” of sentencing elected officials convicted of bribery is “to send a message to other *451 [public officials] that [bribery] is a serious crime that carries with it a correspondingly serious punishment.” Knhlman, 711 F.3d at 1328. By awarding Morgan probation “the district court disregarded the importance of delivering such a message. In fact, [Morgan’s] sentence sends the opposite message — it encourages rather than discourages [public officials] from engaging in [bribery] because they might conclude that the only penaltfy] they will face if they are caught [is probation].” Id. Consequences count and probation doesn’t count enough in this case. And no fine was imposed. Aside from probation, Morgan’s punishment comes down to this: he was required to forfeit the $12,000 bribe, perform 104 hours of community service, and pay the standard $100 special assessment fee.
Consideration of proper factors does not admit to a probationary sentence. But more troubling perhaps are the factors not considered. The court did not mention, even in passing, the government’s credible argument that Morgan should be sentenced to some term of imprisonment in order to avoid unwarranted sentencing disparities. The government cited a number of cases involving political figures accused of using their status for personal gain who were sentenced to terms of imprisonment. Morgan attempted to distinguish these cases by noting the differences in the amounts illegally gained, the attempts to conceal the scheme, and the harm caused. But he cited no case where a defendant was sentenced to probation in the absence of an acceptance of responsibility (guilty plea) or assistance to the government. Morgan did neither. Moreover, the amount of the Silver Oak bribe was relatively small in comparison to the other counts in the indictment but it looms large in terms of harm to public trust. And, as we explained earlier, Morgan attempted to cover up his bribes as legal fees, thereby both abusing his public office and violating the ethics of his profession.
The court did not seriously consider the need for the sentence imposed to promote respect for the law and to provide just punishment for the offense. While we recognize probation is a form of punishment, it is “grossly inappropriate” here:
[I]n the past there have been many cases, particularly in instances of major white collar crime, in which probation has been granted because the offender required little or nothing in the way of institutionalized rehabilitative measures ... and because society required no insulation from the offender, without due consideration being given to the fact that the heightened deterrent effect of incarceration and the readily perceivable receipt of just punishment accorded by incarceration were of critical importance. The placing on probation of [a white collar criminal] may be perfectly appropriate in cases in which, under all the circumstances, only the rehabilitative needs of the offender are pertinent; such a sentence may be grossly inappropriate, however, in cases in which the circumstances mandate the sentence’s carrying substantial deterrent or punitive impact.
S.Rep. No. 98-225, at 91-92 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3274-75.
Upon being elected as an Oklahoma Senator, Morgan swore to, among other things, “not, knowingly, receive, directly or indirectly, any money or other valuable thing, for the performance or nonperformance of any act or duty pertaining to my office, other than the compensation allowed by law.” Okla. Const, art. 15 § 1. Not only did he violate this oath, he violated the trust of his electorate. The entire public suffers as a result and ought not be *452 requested to tolerate a sentence amount grossly at odds with the sentencing guidelines and amounting to little more than a slap on the wrist. Condign punishment demands a significant period of incarceration. Resentencing is required in this case.
We AFFIRM Morgan’s conviction but REVERSE and REMAND for resentenc-ing.

 This order and judgment is an unpublished decision, not binding precedent. 10th Cir. R. *425 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R.App. 32.1. It is appropriate as it relates to law of the case, issue preclusion and claim preclusion. Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A). Citation to an order and judgment must be accompanied by an appropriate parenthetical notation — (unpublished). Id.

. Oklahoma has a "citizen legislature,” meaning the vast majority of its members have a full-time occupation in addition to serving in the legislature. (Morgan's App’x, Vol. 5 at 2036.) In contrast, members of the United States Congress are prohibited from having outside employment.

. The Pro-Tem was described at trial as the “chief operating officer or CEO” of the Senate. (Morgan’s App’x, Vol. 5 at 2038.) The position is responsible for, among other things, setting the agenda, running the caucus meetings, and appointing members of the Senate to the various Senate committees. In one former Senator's view, the Pro Tem is
the most powerful man in the State Capitol.... He hires and fires staff on the Senate, he appoints [members of the Senate to] the [various] committees. And in the State of Oklahoma, with a weak governor form of government, the governor can’t do anything without the advice and consent of the Senate.
(Id., Vol. 4 at 1356-57.)

.During the 2007 and 2008 legislative sessions, Morgan was Co-President Pro Tem because the Senate was equally divided between the two political parties.

. In 2006, Crosby owned twelve assisted living facilities in Nebraska, Oklahoma, Texas, and Wyoming employing about 600 persons, Those employees received "a lot of traffic tickets," (Morgan's App'x, Vol, 5 at 1900.)

. Morgan did not send billing statements to Silver Oak during 2006 although its payments to Morgan began in July 2006. Morgan began sending statements in January 2007 and continued to do so monthly through July 2007. The statements charged Silver Oak $1,000 per month and simply stated the fee was for "[professional [s]ervices [r]endered.” (Morgan’s App'x, Vol. 7 at 2640-46.)

.Arguello initially sent the e-mails to Morgan’s e-mail address at the Senate, Morgan did e-mail Arguello directing her to send all future correspondence to his law office e-mail address.

. As explained at trial, Senate Bill 738 was a "shell bill” when introduced. (Morgan’s App’x, Vol. 5 at 1838.) This means the bill’s language is minimal and expected to be fully developed during the legislative session.

. At trial, Morgan denied all of Crosby's testimony and gave his version of the events, testifying as follows: the alleged meeting at Morgan’s Senate office in May 2006 never occurred. Instead, he met with Crosby sometime in June (after the meeting between Silver Oak and the ODH) at Crosby’s office. Crosby hired him to determine whether Silver Oak could bring a viable lawsuit against the ODH, He reviewed the material attached to Arguel-lo's e-mails and concluded Silver Oak had no basis for a suit and may actually be subject to civil and/or criminal sanctions. Morgan did not leave any written record of his analysis because he was afraid it might be used against his client, He claimed to having arranged a face-to-face meeting with Crosby in September and told Crosby Silver Oak could be in serious trouble. Because Crosby seemed to appreciate his honesty and could need his help in the future, Crosby decided to keep Morgan on retainer.

. The court granted Skeith’s motion for judgment of acquittal on all counts against him (Counts 1 through 62). It also granted Stringer's similar motion as to Counts 30 through 62 (the Tenaska counts). Without either of these defendants, and having alleged no other co-conspirators, the government agreed to dismiss Count 30 (conspiracy count relating to Tenaska) against Morgan. The jury eventually acquitted Stringer of the remaining (Dilworth) counts against him (Counts 1 through 29).

, Trial testimony established that Morgan could, as a legislator-lawyer, sue state agencies, but he could not represent clients before the agencies.

. Morgan did not raise the “bribery requires both the payor and payee to have a corrupt intent” argument in his motion for judgment of acquittal. Our review, therefore, would normally be for plain error. United States v. DeChristopher, 695 F.3d 1082, 1091 (10th Cir.2012), However, we need not decide whether he meets the stringent plain error standard because his argument fails under even the more lenient de novo review. United States v. Cooper, 654 F.3d 1104, 1118 (10th Cir.2011). Moreover, "a conviction in the absence of sufficient evidence will almost always satisfy all four plain-error requirements. Thus, our review for plain error in this context differs little from our de novo review of a properly preserved sufficiency claim,” United States v. Gallegos, 784 F.3d 1356, 1359 (10th Cir. 2015),

. Section 666 is the offspring of 18 U.S.C. § 201. It applies criminal sanctions to bribery by “an agent of an organization, or of a-State, local, or Indian tribal government, or any agency thereof" where the entity "receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, *431 guarantee, insurance, or other form of Federal assistance.” 18 U.S.C. § 666(a)(1), (b). As the parties acknowledge, the Oklahoma legislature qualifies as such an entity.

. Although the quid pro quo requirement for bribery requires an intent to .give or receive something of value in exchange for an official act, it was not necessary for Morgan to have contemplated S.B. 738 or any other specific act when he solicited the bribe (only that he expected to take some official action in exchange for money). See United States v. Abbey, 560 F.3d 513, 520-21 (6th Cir.2009). Morgan so conceded at oral argument.

. According to Morgan, the government admitted at sentencing there was insufficient evidence supporting his conviction by asking "the Court, in spite of its findings, to consider the fact that any fair evaluation of this evidence leads to the conclusion that Mr. Morgan was, at the very least, right up against the line over and over in his dealings with these supposed clients.” (Government's Supp. App'x, Vol. 3 at 1244.) Morgan takes this statement completely out of context. It was made after the court sustained his objection to consideration of the bribes involving clients other than Silver Oak as relevant conduct. The government’s reference to "this evidence,” read in its proper context, refers to the evidence the government presented at sentencing concerning the other bribes, not the bribe involving Silver Oak.

. Although such letter is not required by the Oklahoma Rules of Professional Conduct, it is common when retaining the legal services of an attorney and was also common in Morgan’s practice with other clients. While not determinative, the absence of an engagement letter may, in context, be part of the totality of the circumstances a jury may consider.

. As the court aptly explained in denying Morgan's motion for acquittal based on the sufficiency of the evidence:
[I]t is clear that Morgan's motion must be denied. Each instance on which Morgan relies to dispute the validity of the jury's verdict functions in that way only if the Court views his interpretation of the evi *433 dence in a manner favorable only to Morgan. For example, when arguing the import of his initial conversation with Crosby, Morgan offers a plausible explanation for the conversation between the two men. However, Morgan’s explanation is not the only one, and in fact the jury’s verdict clearly rejects that explanation in favor of the reasoning offered by Plaintiff at trial. As Plaintiff’s brief makes clear, there was evidence offered at trial which would establish each element of the crime of . conviction. That Morgan can now offer an innocent explanation for that evidence does not entitle him to acquittal.
(Morgan’s App’x, Vol. 1 at 273.)

. In his reply brief, Morgan suggests the jury convicted him on Count 63, despite his claim of insufficient evidence, because it was confused and improperly influenced by the evidence presented of the dismissed counts and the evidence concerning his co-defendants, including co-conspirator hearsay, But the jury’s mixed verdict (conviction on one count, acquittal on others, no verdict as to others, and acquittal of co-defendant Stringer) suggests just the opposite; it properly distinguished between the counts and defendants. To the extent Morgan is seeking review of the court’s denial of his motion for a severance of counts and defendants or its admission of co-conspirator hearsay, he is simply too late. See M.D. Mark, Inc. v. Kerr-McGee Corp., 565 F.3d 753, 768 n. 7 (10th Cir.2009) ("[T]he general rule in this circuit is that a party waives issues and arguments raised for the first time in a reply brief.”),

. We read and evaluate jury instructions in their entirety to “determine whether the instructions, examined in the light of the record as a whole, fairly, adequately, and correctly state the governing law and provide the jury with an ample understanding of the applicable principles of law and factual issues confronting them.” United States v. Denny, 939 F.2d 1449, 1454 (10th Cir.1991). Generally, “[f]aulty jury instructions require reversal when (1) we have substantial doubt whether the instructions, considered as a whole, properly guided the jury in its deliberations; and (2) when a deficient jury instruction is prejudicial.” Jones v. United Parcel Serv., Inc., 674 F.3d 1187, 1198 (10th Cir.2012).

. The jury instructions in Ford did describe "intending to be influenced” as Ford’s intent. 435 F,3d at 212, However, the Second Circuit found these instructions lacking because, among other things, they allowed the jury to find such intent simply if Ford was aware of the payee’s intent to give something of value for the purposes of influencing her. Id. at 213. The court held that while this awareness "might well constitute strong circumstantial evidence” of the requisite intent, it alone was not enough, Id. Here, in contrast, the jury was specifically told it had to find Morgan "solicited, demanded, accepted, or agreed to accept anything of value from another person” and he did so "with the intent to be influenced in connection with some business, transaction, or series of transactions of the State of Oklahoma.” (Morgan’s App’x, Vol. 1 at 179.)

. After trial, the defense learned that in 2011 another victim of Crosby’s PMI scheme had contacted a Colorado lawyer who in turn contacted the U.S. Securities and Exchange Commission (SEC). The SEC transferred the matter to the Oklahoma Department of Securities, which brought an action to enjoin Crosby from offering and selling unregistered securities in Oklahoma. Two months after the verdict against Morgan, Crosby stipulated and consented to the injunctive relief requested.

. Morgan complains the information contained in Crosby’s PSR concerning the PMI scheme was simply that Crosby had incorrectly listed the money he received from the scheme as equity when he obtained his line of credit from the bank. He contends this information gave him no basis to investigate the PMI scheme further. But the report did outline the scheme:
Agents also received information from the defendant’s previous accountant that [Crosby] was receiving loans from various individuals in the form of Preferred Member Interest (PMIs) in his numerous business interests and that the defendant guaranteed investors 10% on their investments. The accountant believed these investments began in 2003 or 2004 and estimated [Crosby] received approximately $3,000,000 from investors.
(Morgan’s App’x, Vol. 8 at 4.) This information, in conjunction with the previous disclosure from one of the victims, was sufficient notice of the need to investigate.
Morgan also complains he did not receive the PSR until jury selection, giving him insufficient time to investigate or verify what was said in the report. But, prior to jury selection, Morgan did have the affidavit from one of the victims of the PMI scheme, Moreover, jury selection occurred on February 13, 2012; Crosby was not cross-examined until February 24, In any event, Morgan never requested a continuance.

. Morgan also complains that when his counsel attempted to point out to the jury that Crosby had not been charged with bribery, the court sustained the government’s objection. But the question posed was improper because it indicated the punishment for bribery was fifteen years. See Chapman v. United States, 443 F.26d 917, 920 (10th Cir.1971) (no error in prohibiting jury from being informed of the mandatory minimum sentence); see also United States v. Peña, 930 F.2d 1486, 1491-92 (10th Cir.1991) ("Unless a specific statute permits the jury to play a part in meting out punishment, the jury’s sole role in a criminal case is to determine whether a defendant is guilty of the crime charged.”). Defense counsel elected not to re-phrase the question.

. Morgan says the government rewarded Crosby for his testimony with a sentence of five years of probation. Actually Crosby was sentenced to "zero months” imprisonment, which was the result of a downward variance from the advisory guideline range of 41 to 51 months imprisonment. (Government’s Supp. App’x, Vol. 2 at 980.) While the government did seek a departure for Crosby's cooperation, it still recommended Crosby be sentenced to a year and a day. It appears the sentencing judge (a different judge than the judge in this case) varied downward based on Crosby’s cooperation as well as his significant health issues. In any event, we will not automatically "infer a preexisting deal subject to disclosure under Brady ” merely because the government chooses to treat a witness favorably following a trial. Bell v. Bell, 512 F.3d 223, 234 (6th Cir.2008) (en banc); see also Shabazz v. Artuz, 336 F.3d 154, 165 (2d Cir.2003) (post-trial favorable treatment of a witness, *437 standing alone, is insufficient to establish that the prosecution promised leniency to the witness prior to trial).

. Morgan cites a string of Second Circuit cases wherein the prosecution deliberately withheld evidence or failed to correct perjured testimony, Neither circumstance is present in this case. See, e,g„ United States v. Wallach, 935 F.2d 445, 457 (2d Cir.1991) (government "consciously avoided recognizing” that witness was lying and instead sought to rehabilitate him on redirect examination); Perkins v. Le Fevre, 691 F.2d 616, 619 (2d Cir,1982) (prosecutor deliberately withheld rap sheet of a key witness showing he had two prior felony convictions).

. The government eventually decided not to rely on the amount ($116,500) received from one of the clients, Allied Waste. But this decision did not impact the PSR's calculations.

. Section 3553(a) requires a sentencing court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection.” In determining the particular sentence to be imposed, it shall consider the nature and.circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence, protect the public, and provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner; pertinent guidelines; pertinent policy statements; the need to avoid unwarranted sentence disparities; and the need to provide restitution. 18 U.S.C. § 3553(a). "When a court enhances or detracts from the recommended range through application of § 3553(a) factors ... the increase or decrease is called a variance.” United States v. McComb, 519 F.3d 1049, 1051 n. 1 (10th Cir.2007) (quotations omitted).

. According'to the Concurrence, the government waived (rather than forfeited) any procedural reasonableness argument and thus we ought not consider it, even for plain error, See United States v. Teague, 443 F.3d 1310, 1314 (10th Cir.2006) ("[W]aiver is the intentional relinquishment or abandonment of a known right"; “a party that has waived a right is not entitled to • appellate review,") (quotations omitted). But, even if the government did waive the procedural reasonableness argument, we have the discretion to consider it. See Planned Parenthood of Kan. & Mid-Missouri v. Moser, 747 F.3d 814, 836 (10th Cir.2014) ("Waiver .,. binds only the party, not the court____[I]t is well-settled that courts have discretion to raise and decide issues sua sponte, even for the purpose of reversing a lower-court judgment.”); see also Singleton v. Wulff 428 U.S. 106, 121, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) ("The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases.”). “[A] federal appellate court is justified in resolving an issue not passed on below ... where the proper resolution is beyond any doubt, or where injustice might otherwise result," Singleton, 428 U.S, at 121, 96 S.Ct, 2868. This is such a case, making protracted debate about waiver unnecessary.

. We do not say the effect of the legislation should not be considered at sentencing. Surely, a more severe sentence would be appropriate if Morgan managed to pass legislation that caused specific harm to individuals. But we are concerned that the “no-harm-no-foul” approach to sentencing employed here minimizes the seriousness of this offense. Faith in honest government, the keystone of public trust, is the victim in this case,

. The court’s disagreement with the verdict is not the equivalent of consideration of mitigating circumstances at sentencing. A mitigating circumstance is "[a] fact or situation that does not hear on the. question of a defendant's guilt but that may bear on a court's possibly lessening the severity of its judgment.” Circumstance, Black's Law Dictionary (10th ed. 2014) (emphasis added).

. While the court did not explicitly say Morgan had been adequately punished by these collateral consequences, it did so implicitly by claiming they were adequate deterrents. Not only was it improper for the court to consider these things as "punishment,” they are not adequate deterrents, as we will explain.

. Actually, he varied downward to one day with credit for the day of processing.

. But see United States v. Stewart, 590 F.3d 93 (2d Cir.2009). In Stewart, the sentencing judge determined the defendant’s conviction "made it ‘doubtful that [he] could pursue’ his career as an academic or translator, and therefore the need for further deterrence and protection of the public is lessened because the conviction itself 'already visits substantial punishment on the defendant.’ ” Id. at 141. The Second Circuit found no error; "The district court is specifically required by section 3553(a) to consider the 'just punishment for the offense.' 18 U.S.C. § 3553(a)(2)(A). It is difficult to see how a court can properly calibrate a 'just punishment’ if it does not consider the collateral effects of a particular sentence.” Id. We can’t agree. Considering collateral effects is one thing, myopically dwelling upon them is quite another.

. There are circumstances under which a court may set aside a jury verdict such as a lack of sufficient evidence or a non-harmless procedural error. See Rivera, 411 F.3d at 866; see also United States v. Finn, 375 F.3d 1033, 1040 (10th Cir.2004) (insufficient evidence); United States v. de Hernandez, 745 F.2d 1305, 1310 (10th Cir.1984) (trial judge’s non-harmless ex parte communication with jury). Neither applies here. Indeed, in denying Morgan's motion for judgment of acquittal, the court found the evidence was sufficient to support his conviction. To its credit, it set aside any personal doubts in favor of objective analysis. Unfortunately, that fortitude did not continue.

. We perceive one other procedural error— the court’s relevant conduct decision. See infra n.36.

. In the trial court, the government did not specifically object to the sentence being substantively unreasonable. It did, however, object to Morgan’s request for a sentence of probation and argued a term of imprisonment was warranted. This was sufficient to preserve its substantive unreasonableness argument for appellate review. See United States v. Mancera-Perez, 505 F.3d 1054, 1058-59 (10th Cir.2007); United States v. Torres-Duenas, 461 F.3d 1178, 1182-83 (10th Cir.2006).

. Our review of the evidence — both at trial and at sentencing — strongly suggests that the government proved by a preponderance of the evidence that Morgan’s relevant conduct included, at the very least, the money he received from Dilworth and Tenaska. The evidence showed Morgan received money from these clients yet performed no legal work. As the court pointed out, it may be ethical for an attorney to charge a monthly retainer without necessarily performing any legal work that month. But there was no evidence of any legal work performed by Morgan for these clients; indeed, both clients had other attorneys performing legal work for them. And, while the jury hung on the Dilworth counts and acquitted on the Tenaska counts, those verdicts only establish the government failed to prove these counts under the more onerous beyond a reasonable doubt standard, not the preponderance standard used at sentencing. See United States v. Magallanez, 408 F.3d 672, 684 (10th Cir.2005) ("An acquittal by the juiy proves only that the defendant was not guilty beyond a reasonable doubt. Both before and under the Guidelines, facts relevant to sentencing have generally been found by a preponderance of the evidence.”). Nevertheless, the government has not challenged the court's relevant conduct decision and therefore Morgan has not had an opportunity to address it. Thus, we decline to consider it. Bronson v. Swensen, 500 F.3d 1099, 1104 (10th Cir.2007) ("[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief.”), but see Planned Parenthood of Kan. & Mid-Mo, v. Moser, 747 F.3d 814, 837 (10th Cir.2014) (“A party that waives an issue is not entitled to have us consider and rule on it. But it is well-settled that courts have discretion to raise and decide issues sua sponte, even for the purpose of reversing a lower-court judgment.”). That being said, Morgan’s other bribes are relevant in addressing the substantive reasonableness of his sentence, in particular the seriousness of the offense, an issue the government did raise.

. As the facts of this case illustrate, this distinction is particularly important in circumstances where an elected official receiving bribes might otherwise justify his receipt as payments for legal services or other legitimate income. See John T. Noonan, Jr., Bribes 447 (1984) ("Toqueville, describing America at the end of the 1830s, remarked that it was a nation governed by lawyers. That money paid to lawyers could be explained, or rationalized, or laundered as money paid for actual legal services was a substantial difficulty in isolating bribes paid to lawyers occupying official posts.” (footnote omitted)).