# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-2788

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Derek Lee Preston, | | |
| | * | |
| Appellee. | * | |

_____

Submitted: February 16, 2012
Filed: July 13, 2012

_____

Before RILEY, Chief Judge, WOLLMAN, and SMITH, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Derek Lee Preston was charged with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). The government appeals the district court's order suppressing evidence as fruits of a search conducted without reasonable suspicion. We reverse and remand.

I.

On January 25, 2011, Minneapolis Police Officer George Judkins was on routine patrol in a marked squad car. At approximately 10:20 p.m., Judkins observed

a Ford Explorer perform an illegal U-turn, back into a snow bank, and then temporarily block the intersection at 35th Avenue and Tyler Street. Judkins followed the vehicle, which turned onto Tyler Street and then pulled over to the side of the road without signaling and in the absence of any signal from Judkins that it should do so. Judkins pulled in behind the Explorer and ran the license plate number through his squad car computer.

As he was running the plates, Judkins observed a female, later identified as Sherry Smith, exit the Explorer. She walked north past several homes, turned to look back at Judkins, and then knocked on the door of a house that had no cars parked in front of it, and again looked back at Judkins. Judkins testified that he could see the occupants of the home look through the front window at Smith, but they did not answer the door. Smith's behavior seemed suspicious to Judkins, as though she might be trying to create a distraction.

By this time, Judkins had learned that the Explorer was registered to a car lot, not an individual. When Smith began to walk back to the Explorer, Judkins turned on his squad car lights, exited the car, and walked toward the driver-side door of the Explorer. Judkins approached the driver, who identified himself as Charles Tate and stated that he did not have a driver's license. Tate explained that they were in the area looking for his sister, who was involved in a domestic dispute with her boyfriend. While speaking with Tate, Judkins observed that there were two passengers in the rear seat.

Judkins testified that, during his exchange with Tate, he observed the two passengers looking "a little too nervous" and not making eye contact. Judkins did not include this observation in his police report, a fact noted by the magistrate judge but found to be "not noteworthy" by the district court. Regardless of what was eventually put into writing, Judkins radioed for back-up at the conclusion of his conversation with Tate. Judkins testified that "the activity of driving, and the female getting out,

and the occupants appearing nervous, and the car listing to a car lot, I was nervous for my safety."

After Smith returned to the vehicle, Judkins asked if she was licensed to drive. She replied that she was, although she could not provide a driver's license. Judkins asked why she was not driving, to which Smith replied that she had a toothache. She also told Judkins that the Explorer was hers. She had purchased it five or six days earlier, but did not pick it up until that evening because of a financial issue with the down payment. Smith initially said that the vehicle was insured, but later claimed that the sales person had told her that she did not need insurance to drive it off the lot. Judkins believed that Smith was lying about the insurance, and he asked her to find her proof of ownership or insurance in the vehicle.

Judkins then approached the two other passengers and asked them for identification. The female passenger in the rear driver-side seat could not produce identification, but told Judkins she was Latice Tate, a relative of Charles Tate. During this exchange, Preston, the passenger in the rear passenger-side seat, passed his state identification card to Judkins. Judkins testified that Preston looked familiar but that he could not place him until he saw the name on his identification card, and "[a]s soon as I saw the name on the ID, I remembered who he was."

Judkins knew who Preston was because "[h]e had a history of domestic violence calls and violence calls and some gun cases in our precinct." When asked how he knew about these calls, Preston testified:

> I've been on some of them myself. My partner had one, one of the calls where a gun was recovered out of a bag that belonged to him [Preston], which he told me about. Information was also disseminated in roll call on officers about officer safety, and I remember at the time his name was coming up quite a bit.

-3-

There were three incidents involving Preston in Judkins's precinct, one in 2008 and two in 2004. The reports from the three cases showed that Judkins was not personally on any of the calls. In one of the 2004 incidents, there were reports of gunshots fired, but no charges were filed. Judkins heard about the incident from another officer. In the other 2004 incident, a domestic dispute, Preston's girlfriend reported to police that Preston had been known to carry a gun, but no gun was ever found. Judkins's partner responded to the 2008 incident, another domestic dispute. After Preston was arrested his girlfriend called the police, said that she had found a gun belonging to Preston, and asked the police to retrieve it. Preston was not charged with being a felon in possession at that time. Apart from these three incidents, Judkins had also heard Preston's name mentioned at briefings regarding officer safety. Finally, Judkins knew at the time of the stop that Preston's girlfriend had an order for protection against Preston.

After identifying the passengers, Judkins returned to his squad car and ran their names through a system that checks an individual's driver's license status, vehicle ownership, and warrant status, among other things, but does not perform criminal history checks. Judkins informed the back-up officers via radio that Preston, who had a history of gun possession, was in the rear passenger-side seat of the vehicle. Judkins testified that he informed the other officers of Preston's location because it is officer safety protocol to do so, and he didn't "want somebody walking around who may have a gun on them[.]" Judkins also checked to see if Preston had an outstanding warrant, stating that he hoped he did. After running the names through the system, Judkins determined that none of the Explorer's occupants had outstanding warrants and none were validly licensed to drive the vehicle. Thus, neither Tate nor the passengers could drive the vehicle. Moreover, without proof of insurance, the vehicle could not be parked on the city street.

When the four back-up officers arrived, Judkins asked the occupants of the Explorer to get out so that the officers could search the vehicle before it was

impounded, as required by police policy. The five officers surrounded the vehicle, and Judkins told the others to "keep an eye on everybody's hands" and "get Mr. Preston out of the back seat as soon as possible." Judkins approached the driver's side of the Explorer, and the other officers approached the passenger's side.

During his pat-down search of Preston, Officer Tyrone Barz felt a hard cylinder on the right side of Preston's jacket. Barz asked Preston if he knew what the item was, and Preston responded that he had a permit to purchase the firearm. Barz found a loaded revolver in an inner pocket of the jacket. Preston also told Barz to check his left side jacket pocket, where Barz found marijuana, crack cocaine, and a crack pipe. Barz placed Preston under arrest. Upon contacting the police department call center to find out whether Preston was subject to any restrictions preventing him from carrying a firearm, Barz learned that Preston was on probation for a domestic assault charge.

Preston was charged with being a felon in possession of a firearm. After holding an evidentiary hearing on Preston's motion to suppress and receiving post-hearing briefing, the magistrate judge issued a report and recommendation recommending that the motion be denied. The district court issued an order adopting the magistrate judge's findings of fact, "except to the extent specifically noted" in the court's order. D. Ct. Order of July 21, 2011, at 4. Without any significant departures from the magistrate judge's factual findings, the district court concluded that although this case "was a close call," the officers did not have reasonable suspicion as required for a pat-down search under Terry v. Ohio, 392 U.S. 1, 27 (1968), and thus granted the motion to suppress.

## II.

Preston does not contest the lawfulness of the initial stop or his removal from the vehicle as part of a valid impound search, and so the sole issue on appeal is

whether the pat-down search was constitutionally permissible. "We review the district court's legal conclusions *de novo* and its factual findings for clear error." United States v. Horton, 611 F.3d 936, 940 (8th Cir. 2010) (citing United States v. Griffith, 533 F.3d 979, 982 (8th Cir. 2008)).

The Fourth Amendment forbids unreasonable searches and seizures and usually requires police to obtain a warrant before conducting a search. United States v. Roggeman, 279 F.3d 573, 577 (8th Cir. 2002) (citations omitted). There is an exception to the warrant requirement that permits a limited search for a weapon if there is a reasonable suspicion that the suspect is armed and poses a danger to officers or others. Terry, 392 U.S. at 29.

"Officers may conduct a protective pat-down search for weapons during a valid stop . . . when they have objectively reasonable suspicion that a person with whom they are dealing 'might be armed and presently dangerous and criminal activity might be afoot.'" United States v. Robinson, 664 F.3d 701, 704 (8th Cir. 2011) (quoting United States v. Davis, 202 F.3d 1060, 1063 (8th Cir. 2000)). "In determining whether reasonable suspicion exists, we consider the totality of the circumstances in light of the officers' experience and specialized training." United States v. Davis, 457 F.3d 817, 822 (8th Cir. 2006) (citing United States v. Arvizu, 534 U.S. 266, 273 (2002)). "[A] pat-down is permissible if a 'reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" Horton, 611 F.3d at 941 (quoting Terry, 392 U.S. at 27). "In examining the relevant facts and inferences, we must keep in mind that 'minimally intrusive weapons searches' at traffic stops will more likely be reasonable because of the 'inherent danger' of traffic stops." United States v. Shranklen, 315 F.3d 959, 962 (8th Cir. 2003) (quoting United States v. Menard, 95 F.3d 9, 11 (8th Cir. 1996)).

Preston argues that a criminal record, standing alone, is not sufficient to create reasonable suspicion to support a search or seizure. He repeatedly refers to Judkins's

testimony that the three prior cases in the second precinct were the basis for the pat-down. This argument has three flaws. First, it ignores other relevant facts, including additional testimony by Judkins. Second, focusing on Judkins's perception alone would transform this objective test into a subjective one, contrary to precedent. Third, in determining whether reasonable suspicion existed, we examine the facts collectively rather than asking if each fact individually establishes reasonable suspicion. See Arvizu, 534 U.S. at 274; United States v. Stachowiak, 521 F.3d 852, 856 (8th Cir. 2008) (citation omitted) (discussing reasonable suspicion in the context of a Terry stop). We conclude that the facts in this case, viewed objectively and collectively, created objectively reasonable suspicion to justify a pat-down of Preston.

Considering the facts collectively, this situation arose out of a nighttime traffic stop. See Shranklen, 315 F.3d at 962 (noting the inherent danger of traffic stops); United States v. Roggeman, 279 F.3d at 578 (holding that the fact that a traffic stop takes place at night goes to concerns about officer safety). Further, by walking up the street while looking back at Judkins and then knocking on the door of a home whose occupants were visible but who refused to answer, Smith appeared to be attempting to create a distraction. Moreover, the driver of the vehicle did not have a license and the vehicle was registered to a car lot. See United States v. Garcia, 441 F.3d 596, 599 (8th Cir. 2006) (citing Shranklen, 315 F.3d at 963) (concluding that lack of proof of ownership and valid driver's license supported a finding of reasonable suspicion that defendant might be armed and dangerous). These factors contributed to Judkins's suspicion that criminal activity was afoot and might present a threat to officer safety, as evidenced by Judkins's call for back-up prior to his discovering that the rest of the occupants lacked valid driver's licenses and prior to learning Preston's identity.

Once Judkins learned Preston's identity, he knew that Preston had been involved in prior cases in the second precinct involving domestic violence and guns. Because the most recent of these incidents occurred three years prior to the stop at issue here, Preston argues that such information, without more, was stale and could

not create reasonable suspicion. But "[t]here is no bright-line test for determining when information is stale." Stachowiak, 521 F.3d at 856 (citing United States v. Koelling, 992 F.2d 817, 822 (8th Cir. 1993)); see also Garcia, 441 F.3d at 599 (holding that a prior drug conviction, and driving a car owned by neither the passenger nor driver who were both without valid driver's licenses created reasonable suspicion). We believe that these prior incidents were relevant when considered with Judkins's knowledge that Preston's girlfriend had an order for protection against him and that Preston's name had been mentioned, around this time, at officer safety briefings. See United States v. Davis, 471 F.3d 938, 945 (8th Cir. 2006) (holding that unspecified prior intelligence that defendant possessed firearms was one of several articulable facts creating reasonable suspicion); United States v. Walker, No. 96-1124, 1996 WL 686160, at *1 (8th Cir. Dec. 2, 1996) (holding that a "safety warning" posted at police headquarters two or three weeks before a stop created reasonable suspicion for a pat-down).

Finally, we recognize that allowing the occupants of the vehicle to walk away unsearched would have posed a further threat to officer safety. As we noted in United States v. Oliver, 550 F.3d 734 (8th Cir. 2008), a person who is allowed to walk away from a stop without a pat-down search could hypothetically turn around and shoot officers remaining at the scene. Id. at 738.

In sum, we disagree with the district court's legal conclusion that "[t]here was no other conduct by the Defendant or the other occupants in the car, based upon the totality of the circumstances, and taking into account the officers' deductions and rational inferences resulting from training and experience, which created a specific, reasonable, and articulable suspicion that their safety or that of others was in danger." D. Ct. Order of July 21, 2011, at 10. We conclude that the totality of the circumstances created an objectively reasonable suspicion that Preston might be armed and dangerous, and thus the pat-down search was constitutionally permissible.

## III.

The order granting the motion to suppress is reversed, and the case is remanded to the district court for further proceedings.

_____