# United States Court of Appeals
### For the Eighth Circuit

_____

No. 20-3635
_____

United States of America

*Plaintiff - Appellee*

v.

Eric Deshon Williams

*Defendant - Appellant*

_____

No. 21-1069
_____

United States of America

*Plaintiff - Appellant*

v.

Eric Deshon Williams

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Central
_____

Submitted: December 17, 2021
Filed: July 13, 2022
_____

Before LOKEN, SHEPHERD, and STRAS, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

After two separate arrests stemming from two traffic stops that each yielded significant amounts of various drugs, Eric Deshon Williams was charged with 9 conspiracy- and drug-related counts in a 19-count second superseding indictment. The district court[1] denied Williams's motion to suppress the evidence recovered during these stops, and a jury convicted Williams on all counts. At sentencing, the district court varied downward from the United States Sentencing Guidelines range of 360 months to life imprisonment and sentenced Williams to 180 months imprisonment and 5 years supervised release. Williams appeals his conviction, arguing that the district court erred in denying his motion to suppress, the evidence was not sufficient to support his conviction on three of the nine counts, and the district court gave an erroneous jury instruction. The government cross-appeals Williams's sentence, arguing that the district court procedurally erred when it relied on clearly erroneous facts. Having jurisdiction under 28 U.S.C. § 1291, we affirm in all respects.

I.

The first traffic stop giving rise to the offenses of conviction occurred on March 12, 2015. Investigator Austin McKinness with the Pulaski County Sheriff's Office (PCSO), while conducting surveillance in an unmarked unit, observed a dark-colored Honda Accord cross the line marking its lane several times. Investigator McKinness radioed the traffic violation to other units, and Detective Jonathan Parks, who was driving a marked unit, caught up to the vehicle, which was being driven by Williams, and initiated a traffic stop. At the time Detective Parks

_____

[1]The Honorable Kristine G. Baker, United States District Judge for the Eastern District of Arkansas.

stopped Williams, Detective Parks was alone, it "was kind of dark outside," and it was raining. When Detective Parks asked Williams for his driver's license, proof of insurance, and registration, he observed that Williams was "shaking, kind of trembling" and would not look up at him. Noticing that Williams appeared nervous, Detective Parks asked Williams to step out of his vehicle and come to the back of the vehicle. Williams complied, and Detective Parks noticed that Williams kept reaching for the front pocket of his hoodie and continued to do so, despite Detective Park's verbal commands to keep his hands on the car. For safety purposes, Detective Parks conducted a pat-down search for weapons, during which Williams continued to reach for his pocket. When Detective Parks felt the pocket, he felt something hard. Detective Parks testified that the object did not feel like a gun, but "anything can be used as a weapon," so he reached into the pocket and removed what he discovered to be four bags containing golf-ball-sized amounts of suspected methamphetamine. At this point, Detective Parks arrested Williams and placed him in the back of his unit. Because there were no other passengers in Williams's vehicle, Detective Parks called a wrecker to tow the vehicle. Detective Parks testified that, pursuant to PCSO policy, he conducted an inventory search of Williams's vehicle before it was towed; however, in his report that he prepared immediately after his encounter with Williams, Detective Parks characterized this search as a probable cause search. While searching Williams's vehicle, Detective Parks saw an unmarked pill bottle in plain sight that had three different types of pills inside. Detective Parks also found suspected crack cocaine, suspected marijuana, and three more baggies of suspected methamphetamine in Williams's vehicle.

The second stop occurred on November 1, 2015, at which time Williams's co-defendant, Damian Mitchell, was the subject of an investigation involving multiple law enforcement agencies, including the PCSO and Drug Enforcement Administration (DEA). That day, in conjunction with that investigation, law enforcement was conducting electronic surveillance of Mitchell's cell phone and physical surveillance of Mitchell's residence. Law enforcement intercepted two calls between Mitchell and Williams regarding narcotics activity that was to take place later that evening, and Williams was later observed arriving at and departing

from Mitchell's residence in a silver Chevrolet Malibu driven by a female driver. Surveillance units began following Williams's vehicle, and DEA Investigator Cardarious Walker contacted PCSO Deputy Andrew Garrison, who was driving a marked PCSO unit and assisting the DEA. Investigator Walker told Deputy Garrison that Williams's vehicle was suspected of picking up "an amount of narcotics" and instructed Deputy Garrison to locate and stop Williams's vehicle if he could establish probable cause. Deputy Garrison was able to locate Williams's vehicle and subsequently witnessed the vehicle drive left of the center line and right of the right-hand fog line multiple times. Deputy Garrison initiated a traffic stop, and the vehicle pulled over in front of a residence on Wooten Road. Deputy Garrison asked the driver of the vehicle for her license and registration and asked Williams if he had any form of identification. Williams did not have an ID but did provide his name and date of birth. Deputy Garrison took Williams's information back to his patrol unit, where he confirmed that Williams had an active felony warrant. At this point, Williams opened the passenger door of his vehicle, and when Deputy Garrison told him to get back into the vehicle, Williams fled and ran into the nearby residence. After opening the front door of the residence and observing Williams coming out of the back bedroom, Deputy Garrison ordered Williams to come to the front door and get on the ground. Williams complied and was taken into custody.

After Williams had been taken into custody, officers ordered those who remained inside the residence to come outside, including a woman who told Deputy Garrison and Investigator Walker that she rented the Wooten Road residence with her boyfriend and gave consent for officers to search the residence. The woman accompanied officers to the back bedroom and told officers that Williams came through the front door, ran into the back bedroom with a black sack in his hands, and returned to the front of the house without the sack. Investigator Walker searched the bedroom and located a black plastic sack containing suspected methamphetamine and cocaine inside of a pillowcase. At trial, the woman testified that she "[p]robably" had methamphetamine in her house "earlier that day," but she had "flushed it down the toilet" and there was nothing in her house except for "some weed and rolling papers" when she saw law enforcement outside her house. Another

-4-

occupant of the house testified that Williams ran to the back of the house "as if he were carrying a football."

In a 19-count second superseding indictment charging multiple defendants, Williams was indicted on 9 conspiracy- and drug-related charges. As relevant to this appeal, these charges included conspiracy to possess with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), (b)(1)(C) and 846 (Count 1); possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A) (Count 14); and possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C) (Count 15). Williams filed a motion to suppress the evidence seized as a result of the March 12 and November 1 traffic stops, arguing that each violated his Fourth Amendment right to be free from unreasonable search and seizure. The district court denied Williams's motion. As to the March 12 stop, the district court concluded that the traffic stop was supported by probable cause and that Detective Parks's pat-down search of Williams's person and inventory search of Williams's vehicle did not violate the Fourth Amendment. The district court further concluded that the November 1 traffic stop was supported by probable cause, regardless of whether Deputy Garrison witnessed the alleged traffic violations, because he was instructed to stop Williams's vehicle by Investigator Walker, who gave the instruction after listening to the phone conversations between Mitchell and Williams and learning from surveillance that Williams had arrived at and departed from Mitchell's residence shortly after the second conversation.

After a three-day trial, the jury returned a guilty verdict on all nine counts. At sentencing, the district court calculated a total offense level of 37 and a criminal history category of VI, resulting in a Guidelines range of 360 months to life imprisonment. Williams asked for a downward variance to 15 to 20 years imprisonment in light of abuse he experienced as a child. The government, however, requested a sentence within the Guidelines range, arguing that Williams's criminal history was "overwhelming" and "far above and beyond" that of his co-defendants. The district court noted that, though Williams had a lengthy criminal history and

more criminal history points than his co-defendants, there were co-defendants in his case that had been sentenced with a criminal history category of VI. In particular, the district court focused on Jeremy Larry, a co-defendant who had a criminal history category of VI and an offense level "high in the 30s" and was sentenced to 120 months imprisonment. After considering the factors set forth under 18 U.S.C. § 3553(a), the district court sentenced Williams to concurrent sentences of 180 months imprisonment and 5 years supervised release on each count. Williams appeals his convictions, and the government cross-appeals his sentence.

## II.

Williams argues that the district court erred by denying his motion to suppress; that the evidence presented at trial was insufficient to support the jury's finding of guilt as to Counts 14 and 15 of the second superseding indictment, which charged Williams with possession of the methamphetamine and cocaine found in a pillowcase inside the Wooten Road residence on November 1, 2015; and that the district court erred in not giving a jury instruction on the heightened standard in constructive possession cases. We address each of these arguments in turn.

## A.

Williams argues that the March 12 stop and accompanying pat-down and inventory searches, as well as the November 1 stop, were unconstitutional and that the district court erred in denying his motion to suppress the evidence recovered pursuant to these illegal stops and searches. "A mixed standard of review applies to the denial of a motion to suppress evidence. 'We review the district court's findings of fact under the clearly erroneous standard, and the ultimate conclusion of whether the Fourth Amendment was violated is subject to de novo review.'" United States v. Williams, 777 F.3d 1013, 1015 (8th Cir. 2015) (emphasis omitted) (citation omitted).

We begin with Williams's argument that the March 12 and November 1 traffic stops were not supported by probable cause or reasonable suspicion because the government failed to show that a traffic violation was committed on either occasion.

> "Under the Fourth Amendment, a traffic stop is reasonable if it is supported by either probable cause or an articulable and reasonable suspicion that a traffic violation has occurred." Any traffic violation, regardless of its perceived severity, provides an officer with probable cause to stop the driver, but the officer must have an objectively reasonable basis for believing that the driver has committed a violation.

United States v. Walker, 840 F.3d 477, 483 (8th Cir. 2016) (citation omitted). "Whether probable cause existed is a legal question reviewed de novo." United States v. Adler, 590 F.3d 581, 583 (8th Cir. 2009).

Williams argues that the evidence presented at the suppression hearing did not establish that officers observed a traffic violation on either March 12 or November 1. Specifically, he argues that the evidence does not demonstrate that Ark. Code Ann. § 27-51-302(1) was violated on either occasion.[2] Ark. Code Ann. § 27-51-302(1) provides that

> [w]henever any roadway has been divided into two (2) or more clearly marked lanes for traffic, . . . [a] vehicle shall be driven as nearly as practical within a single lane and shall not be moved from the lane until the driver has first ascertained that movement can be made with safety[.]

Here, the district court found credible and credited the testimony of Investigator McKinness, who stated that, on March 12, 2015, she observed Williams's vehicle "cross the line of his lane several times," R. Doc. 320, at 7, and that "if he would have continued to do that and there would have been a vehicle next to him, he could have struck that vehicle," R. Doc. 320, at 11. The district court also credited the

_____

[2]We note that the district court found probable cause existed but in doing so did not specifically identify § 27-51-302(1).

testimony of Deputy Garrison, who stated that, on November 1, 2015, he observed the vehicle Williams was riding in drive "[l]eft of center and right of the fog line three times."  R. Doc. 320, at 52.  Williams's argument that the evidence at the suppression hearing did not establish that either vehicle actually crossed over into another lane of traffic or that there was anything dangerous or unsafe about the vehicles' movements is plainly foreclosed by the testimony of Investigator McKinness and Deputy Garrison.  Because "[a] credibility determination made by a district court after a hearing on the merits of a motion to suppress is virtually unassailable on appeal" and we discern no clear error in the district court's credibility findings, we conclude that this argument fails.  See United States v. Stewart, 32 F.4th 691, 694 (8th Cir. 2022) (alteration in original) (citation omitted).  Further, to the extent that Williams argues that the government failed to show that he and the driver of the silver Malibu did not ascertain the safety of their movements, we find such argument unavailing.  Even if each driver did ascertain that it was safe to cross the lines marking their lane multiple times, Investigator McKinness's and Deputy Garrison's observations provided a reasonable basis for the belief that the drivers were violating § 27-51-302(1).  See Walker, 840 F.3d at 483 (finding that even if officer was mistaken that crack in driver's windshield obstructed driver's view, his observations about the severity of the crack provided reasonable basis for belief that driver was violating traffic law); cf. United States v. Smart, 393 F.3d 767, 771 (8th Cir. 2005) ("The possibility that there was no violation, and the subsequent determination that there was not, does not mean that the initial suspicion was unreasonable.").

Williams next argues that the pat-down search conducted by Detective Parks during the March 12 stop violated his Fourth Amendment rights because Detective Parks lacked reasonable suspicion to perform the pat-down search and exceeded the boundaries of the Fourth Amendment when he reached into Williams's pocket. "Officers may conduct a protective pat-down search for weapons during a valid stop . . . when they have objectively reasonable suspicion that a person with whom they are dealing might be armed and presently dangerous . . . ." United States v. Green, 946 F.3d 433, 439 (8th Cir. 2019) (alterations in original) (citation omitted).

"In determining whether reasonable suspicion exists, we consider the totality of the circumstances in light of the officers' experience and specialized training." United States v. Preston, 685 F.3d 685, 689 (8th Cir. 2012) (citation omitted). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." United States v. Oliver, 550 F.3d 734, 738 (8th Cir. 2008) (quoting Terry v. Ohio, 392 U.S. 1, 27 (1968)). "In examining the relevant facts and inferences, we must keep in mind that 'minimally intrusive weapons searches' at traffic stops will more likely be reasonable because of the 'inherent danger' of traffic stops." Preston, 685 F.3d at 689 (citation omitted).

Here, Detective Parks was alone when he pulled Williams over, and it was getting dark outside and raining. Williams provided his license, proof of insurance, and registration, at which time Detective Parks noticed that Williams was shaking and would not make eye contact with him. Williams complied with Detective Parks's request that he exit and come to the back of the vehicle, but repeatedly reached towards the front pocket of his hoodie despite being told several times not to do so. Williams's nervousness, combined with his repeated reaching towards his front pocket despite Detective Parks's commands not to, gave rise to reasonable suspicion that he might be armed and presently dangerous. See United States v. Cotton, 782 F.3d 392, 396 (8th Cir. 2015) (finding officers had reasonable suspicion where "encounter occurred in a violent area, [defendant] reached for his waistband as the officers were approaching, and he had a nervous look on his face"); United States v. Ellis, 501 F.3d 958, 962 (8th Cir. 2007) (finding "combination of [defendant's] nervous behavior and the movement of his hand toward his pocket after he was questioned about a weapon" during encounter in house known for drug activity gave rise to reasonable suspicion to justify pat-down search); United States v. Peoples, 925 F.2d 1082, 1087 (8th Cir. 1991) (considering defendant's refusal to comply with officers command in reasonable suspicion analysis).

Further, Detective Parks did not exceed the allowable scope of the pat-down search when he reached into Williams's pocket. "Because the 'sole justification' for

such a search is the protection of the officer and others, its scope must be confined to a search reasonably designed to discover concealed weapons." United States v. Muhammad, 604 F.3d 1022, 1026 (8th Cir. 2010) (citation omitted). "An officer may, however, seize nonthreatening contraband detected during a pat-down search for weapons as long as the search itself 'stays within the bounds marked by Terry.'" United States v. Hanlon, 401 F.3d 926, 930 (8th Cir. 2005) (quoting Minnesota v. Dickerson, 508 U.S. 366, 373 (1993)). Still, "if an officer seizes an item of contraband from an individual's person after having concluded that no weapons are present, the evidence will be suppressed." Id. Here, there is no indication in the record that Detective Parks had already concluded that no weapons were present when he removed the bags of methamphetamine from Williams's front pocket. Though he testified that the object did not feel like a gun, he had not ruled out that the object could have been a weapon. Thus, we conclude that Detective Parks stayed within the bounds of Terry when he reached into Williams's front pocket. See Muhammad, 604 F.3d at 1026-27 (holding that pat-down search stayed within the bounds of Terry where officer determined that four-inch by three-inch hard object in defendant's back pocket could be a weapon or could conceal a weapon); Hanlon, 401 F.3d at 930 (concluding pat-down search did not exceed allowable scope of Terry where officer was concerned that "admittedly small object in [defendant's] coin pocket could have been a pocketknife or some other type of weapon").

Finally, Williams argues that the inventory search of his vehicle conducted during the March 12 stop was unconstitutional. "The Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" United States v. Taylor, 636 F.3d 461, 464 (8th Cir. 2011) (quoting Mincey v. Arizona, 437 U.S. 385, 390 (1978)). "Inventory searches are one of the well-defined exceptions to the warrant requirement of the Fourth Amendment." United States v. Morris, 915 F.3d 552, 556 (8th Cir. 2019) (citation omitted). "The inventory search exception . . . permits law enforcement to inventory the contents of a vehicle that is

-10-

lawfully taken into custody, even without a warrant or probable cause to search." United States v. Garreau, 658 F.3d 854, 857 (8th Cir. 2011). Still, "'[a]n inventory search must be reasonable under the totality of the circumstances'; therefore, law enforcement may not use an inventory search as 'a ruse for general rummaging in order to discover incriminating evidence.'" United States v. Nevatt, 960 F.3d 1015, 1020 (8th Cir. 2020) (per curiam) (citation omitted). "The reasonableness requirement is met when an inventory search is conducted according to standardized police procedures, which generally 'remove the inference that the police have used inventory searches as "a purposeful and general means of discovering evidence of a crime."'" Taylor, 636 F.3d at 464 (citation omitted).

Here, though neither party introduced a written standard police procedure for inventory searches or an inventory of the vehicle's contents as evidence at the suppression hearing, the district court found Detective Parks credible, that his uncontroverted testimony was sufficient to establish that the PCSO had an inventory search policy, and that the inventory search of Williams's vehicle complied with that policy. Accordingly, the district court concluded that the search of Williams's vehicle did not violate the Fourth Amendment. Because "[a] credibility determination made by a district court after a hearing on the merits of a motion to suppress is virtually unassailable on appeal," Nevatt, 960 F.3d at 1020 (citation omitted), and nothing in the record indicates that the PCSO did not have an inventory search policy or that Detective Parks failed to follow that policy, we decline to disturb the finding of the district court, see United States v. Lowe, 9 F.3d 43, 46 (8th Cir. 1993) (finding testimony that department policy was to inventory vehicles of persons taken into custody sufficient to establish existence of inventory search policy). Further, the record does not indicate that Detective Parks had an investigative motive. Detective Parks testified that, in accordance with PCSO policy, because there were no occupants in Williams's vehicle to take control of the vehicle, he called a wrecker and searched Williams's vehicle before it was loaded on the wrecker and, despite his indication on his report that he searched the car pursuant to probable cause, he would have conducted an inventory search regardless of whether or not he believed there was probable cause to search the vehicle. Cf.

-11-

Taylor, 636 F.3d at 465 (concluding inventory search was a pretext for an investigatory search where officer "testified that she would not have arrested [defendant], impounded his vehicle, or inventoried the contents of the truck if not for her belief that the vehicle contained evidence of a narcotics crime"). That Detective Parks happened upon contraband in the course of this search does not transform an otherwise valid inventory search into a violation of the Fourth Amendment. See Garreau, 658 F.3d at 858 ("Officers performing a lawful inventory search 'may keep their eyes open for potentially incriminating items that they might discover in the course of an inventory search, as long as their sole purpose is not to investigate a crime.'" (citation omitted)).

B.

Williams next argues that there was insufficient evidence to support the jury's finding of guilt as to Counts 14 and 15 of the second superseding indictment, which charged Williams with possession of the methamphetamine found inside the pillowcase on November 1, in violation of § 841(a)(1), (b)(1)(A), and the cocaine found inside the pillowcase, in violation of § 841(a)(1), (b)(1)(C), respectively. He contends that the government failed to demonstrate, and no reasonable juror could have concluded, that he possessed these drugs. "We review 'sufficiency of the evidence de novo, viewing evidence in the light most favorable to the jury's verdict, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict.'" United States v. Cooper, 990 F.3d 576, 581 (8th Cir. 2021) (citation omitted). "The verdict will be upheld if there is any interpretation of the evidence that could lead a reasonable jury to convict." United States v. Njoroge, 25 F.4th 555, 558 (8th Cir. 2022) (citation omitted).

"In order to prove that [Williams] possessed [methamphetamine and cocaine] with the intent to distribute it, violating 21 U.S.C. § 841(a)(1), the [g]overnment must prove that he knowingly possessed the [drugs] with the intent to distribute [them]." United States v. Wright, 739 F.3d 1160, 1167 (8th Cir. 2014); see also United States v. Espinoza, 684 F.3d 766, 777 (8th Cir. 2012) ("The offense of

-12-

possession with intent to distribute consists of two elements: knowing possession of [cocaine and methamphetamine] and the intent to distribute it." (alteration in original) (citation omitted)). Williams argues only that the evidence at trial was insufficient to prove that he possessed the drugs. "Proof of actual possession or constructive possession is sufficient to satisfy the element of knowing possession under [§] 841(a)(1)." United States v. Johnson, 18 F.3d 641, 647 (8th Cir. 1994). Constructive possession exists where a defendant has "*knowledge* of presence, plus *control* over the thing." Id.; see also United States v. Cuevas-Arrendondo, 469 F.3d 712, 715 (8th Cir. 2006) ("Constructive possession requires knowledge of an object, the ability to control it, and the intent to do so." (citation omitted)). Still, to prove constructive possession, the government must "establish some nexus between a defendant and the contraband; mere physical proximity to the contraband is insufficient." Johnson, 18 F.3d at 647.

Here, there is ample evidence supporting the conclusion that Williams had constructive possession of the black sack of methamphetamine and cocaine found inside the pillowcase at the Wooten Road residence on November 1. The evidence at trial demonstrated that Williams was observed arriving at and departing from Mitchell's home shortly after Williams called Mitchell and arranged to buy methamphetamine and cocaine from him; surveillance units followed the vehicle Williams was riding in from the time the vehicle left Mitchell's residence until Deputy Garrison stopped the vehicle; while Deputy Garrison was running Williams's information through the police system, Williams fled into a nearby residence; the woman who rented the house told officers that Williams burst through the front door with a black sack in his hands, ran into the back bedroom, and came back to the front of the house without the black sack; another occupant of the house testified that Williams ran through the house "as if he were carrying a football"; the woman who rented the house testified that there was no methamphetamine in her house before Williams ran in and out of her house; and officers found a black sack containing methamphetamine and cocaine in the back bedroom of the house. Viewing this evidence in the light most favorable to the verdict, a reasonable jury

could conclude that Williams knowingly possessed the black sack containing methamphetamine and cocaine found inside the pillowcase.[3]

## C.

Williams finally argues that the district court erred in not instructing the jury that a heightened showing is required in constructive possession cases where contraband is found in the home of another. Williams does not clearly explain what exactly this "heightened showing" is, and he does not dispute that he failed to object to the relevant instruction at trial. "We typically review a challenge to jury instructions for an abuse of discretion. Where a party fails to timely object to an instruction at trial, however, we review only for plain error." United States v. Poitra, 648 F.3d 884, 887 (8th Cir. 2011) (citation omitted). "To obtain relief under plain-error review, the party seeking relief must show that there was an error; the error is clear or obvious under current law; the error affected the party's substantial rights; and the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." United States v. Bolman, 956 F.3d 583, 587 (8th Cir. 2020). "The district court has wide discretion in formulating appropriate jury instructions." Poitra, 648 F.3d at 887 (citation omitted). "A jury instruction is plainly erroneous if it misstates the law." United States v. Fast Horse, 747 F.3d 1040, 1042 (8th Cir. 2014). However, "[j]ury instructions are adequate if, taken as a whole, [they] adequately advise the jury of the essential elements of the offenses charged and the

---

[3]In two sentences in his opening brief to this Court and by passing mention in his reply brief, Williams seems to argue that because the evidence is not sufficient to support his convictions on Counts 14 and 15, his conspiracy conviction under Count 1 should be vacated as well. Because we conclude that the evidence is sufficient to support Williams's convictions on Counts 14 and 15, we need not address this argument. Further, even if we were to conclude that the evidence is insufficient to support Williams's convictions on Counts 14 and 15, Williams fails to meaningfully argue that such a finding necessitates vacating his conviction on Count 1 as well. See Ahlberg v. Chrysler Corp., 481 F.3d 630, 634 (8th Cir. 2007) ("[P]oints not meaningfully argued in an opening brief are waived.").

burden of proof required of the government." Id. (second alteration in original) (citation omitted).

Here, the instruction given to the jury was Eighth Circuit Manual of Model Jury Instructions 8.02, which reads in relevant part: "A person who, although not in actual possession, has both the power and the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons, is then in constructive possession of it." Compare Eighth Circuit Manual of Model Jury Instructions (Criminal) 8.02 (2018), with R. Doc. 370, at 11, and R. Doc. 437, at 50. "A defendant is not entitled to a particularly worded instruction as long as the instructions fairly and adequately instruct the jurors on the applicable law," United States v. Gilmore, 968 F.3d 883, 886 (8th Cir. 2020), and this Court has found this instruction to be adequate, see, e.g., Espinoza, 684 F.3d at 783 (holding possession instruction that followed 8.02 "fairly and adequately submitted the issue of possession to the jury"). Thus, we find that the district court did not commit plain error by failing to sua sponte instruct the jury as to some unspecified "heightened showing" required to prove constructive possession.

III.

The government cross-appeals Williams's sentence, arguing that the district court procedurally erred when it relied on clearly erroneous facts in imposing a substantial downward variance. The government contends that the district court erred when it concluded that Williams and his co-defendant, Jeremy Larry, were similarly situated because, contrary to the district court's statement that Larry had an offense level in the "high 30s," Larry's base offense level was 32 and his total offense level was 29. Typically, "[i]n reviewing a sentence for procedural error, we review the district court's factual findings for clear error and its application of the guidelines de novo." United States v. Ayres, 929 F.3d 581, 583 (8th Cir. 2019) (citation omitted). However, the government failed to object to the district court's alleged procedural error at sentencing, and therefore, we review the district court's sentence for plain error. See United States v. Wise, 17 F.4th 785, 788 (8th Cir.

-15-

2021). "To obtain relief under plain-error review, the party seeking relief must show that there was an error; the error is clear or obvious under current law; the error affected the party's substantial rights; and the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Bolman, 956 F.3d at 587.

> "Procedural error" includes "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range."

United States v. Feemster, 572 F.3d 455, 461 (8th Cir. 2009) (en banc) (quoting Gall v. United States, 552 U.S. 38, 51 (2007)).

Here, the district court did mistakenly state that Larry had an offense level in the high thirties when he actually had a total offense level of 29. However, the district court also considered that both Williams and Larry had a criminal history category of VI and still applied the variance after hearing the government's arguments that Larry accepted responsibility and Williams did not, Williams's criminal history score was much higher than Larry's, and Williams's conduct in the case was "more" than Larry's. Further, the district court noted the absence of firearms and violence in the case, Williams's traumatic childhood, and Williams's progress in understanding and coming to terms with himself and his history. In light of these circumstances, we conclude that there is no reasonable probability that, but for the district court's error, Williams would have received a higher sentence, and thus, the district court's error did not affect the government's substantial rights. See United States v. McClendon, 609 F. App'x 488, 489 (9th Cir. 2015) ("Ordinarily, an error affects an appellant's substantial rights if it 'affect[s] the outcome of the district court proceedings.'" (alteration in original) (quoting Puckett v. United States, 556 U.S. 129, 135 (2009)); United States v. Morgan, 635 F. App'x 423, 442 (10th Cir. 2015) (explaining that an error "that affects substantial rights" is one that "affects the outcome of the proceeding" (citation omitted)); cf. United States v. Isler, 983

-16-

F.3d 335, 343 (8th Cir. 2020) ("To demonstrate an effect on substantial rights, [the defendant] must show a reasonable probability that but for the error, he would have received a more favorable sentence." (alteration in original) (citation omitted)).

## IV.

For the foregoing reasons, we affirm Williams's conviction and sentence.

_____